Shirley KAUCHICK and Joseph Kauchick, (Plaintiffs) Appellants,

v.

L. R. WILLIAMS, D. O., and R. G. Mattison, D. O., Respondents.

No. 52127.

Supreme Court of Missouri, En Banc.

Nov. 25, 1968.

James J. Raymond, Clayton, attorney for appellants.

Orville Richardson, Hullverson, Richardson & Hullverson, St. Louis, attorneys for respondents.

STORCKMAN, Judge.

This is a malpractice action by a wife and her husband in two counts. In the first count the wife seeks to recover damages in the sum of $350,000; in count two the husband prays for $60,000. Among other defenses, the defendants urged that the action was barred by the two-year statute of limitations, § 516.140, RSMo 1959, V.A.M.S. The plaintiffs contend the running of the statute of limitations was tolled because of fraudulent concealment by the defendants. Judgment was rendered on verdicts directed in favor of the defendants and the plaintiffs have appealed. After an opinion was adopted in Division One of this court affirming the judgment, the appeal was transferred to the Court En Banc. We reach the same result as the divisional opinion and considerable portions of that opinion will be incorporated herein without quotation marks.

Mrs. Shirley Kauchick consulted Dr. L. R. Williams, an osteopathic physician engaged in general practice, in February, 1958. Doctor Williams found Mrs. Kauchick pregnant and fixed her expected delivery date as October 8, 1958. Mrs. Kauchick saw Dr. Williams regularly during the course of her pregnancy and was under his exclusive care. In September 1958 at Dr. Williams's direction, X rays of Mrs. Kauchick's pelvis were made at the Normandy Osteopathic Hospital. The X rays were examined by Dr. R. G. Mattison, a doctor of osteopathy and roentgenologist at the hospital. Dr. Mattison reported that his examination of the X rays showed an intertuberous pelvic measurement of 11 centimeters. His report stated: "The bony pelvic measurements fall within a (sic) centrally normal limits. We feel that vaginal delivery can be accomplished." Dr. Williams made no

direct measurement of Mrs. Kauchick's pelvis and, accepting Doctor Mattison's X ray report, prepared for a vaginal delivery.

On October 16, Mrs. Kauchick's labor pains began and she was admitted to the Normandy Osteopathic Hospital at about 6:00 a. m. She was placed in the labor room where Dr. Williams visited her from time to time. At approximately 2:38 p. m., the second stage of Mrs. Kauchick's labor began and she was taken to the delivery room. There Dr. Williams attempted to deliver the child vaginally without the use of forceps. He was unsuccessful. Mrs. Kauchick remained in the delivery room about four hours. At the end of that time, she was returned to the labor room and Dr. Williams called in Dr. Lloyd Olson, a specialist in obstetrics. Dr. Olson conducted a pelvic examination and then ordered Mrs. Kauchick to X ray where X rays were taken. Thereafter a saddle block anesthetic was administered and Dr. Olson unsuccessfully attempted delivery by the use of forceps. At 10:30 p. m., Dr. Olson reported that "an adequate attempt has been made to deliver this patient vaginally. She has an acute pelvic angulation with a tense vaginal musculature * * * and therefore recommend caesarean section." Dr. John Olson, a brother of Lloyd, was called to the hospital and at 11:40 p. m., he began the surgical procedure. "A lower segmental transverse incision was made with failure of delivery of the fetal head because of deep placement in the birth canal. An incision was made in the midline, extending superiorly and the infant delivered breech (at 11:50 p. m.)."

Mrs. Kauchick's post-operative course was uneventful. She discussed the operation with Dr. Williams and inquired why she had the Caesarean section when she "was supposed to be all right." According to Mrs. Kauchick, Dr. Williams told her that he did not know, "that it was just one of these things that happened, that

he had performed Caesarean sections quite often. I asked him if he thought I could have other children, and he said well yes, I do because a Caesarean section doesn't mean that you can't have any other children." Mrs. Kauchick did not recall any discussion of whether she would have to have a Caesarean section in such event. Mrs. Kauchick was discharged from the hospital on October 26. Shortly thereafter she saw Dr. Williams at his office and he removed stitches from the operative incision. Mrs. Kauchick took the baby to Dr. Williams for shots "a couple of times." According to Dr. Williams, he last saw Mrs. Kauchick or the child on February 27, 1959. Mrs. Kauchick had no complaint at that time.

In September 1959 Mrs. Kauchick again became pregnant. The physician then taking care of her child referred her to Dr. Michael McNalley, a doctor of medicine specializing in gynecology. Mrs. Kauchick first saw Dr. McNalley in December 1959. Dr. McNalley measured Mrs. Kauchick's pelvic structure and found it quite small, measuring 5½ centimeters. In view of this finding and the previous Caesarean section, Dr. McNalley planned for a Caesarean delivery. However, on March 5, 1960, Mrs. Kauchick's membrane ruptured and a miscarriage followed. In June, 1960, Mrs. Kauchick again became pregnant, but again a miscarriage occurred, this time in August 1960 at Tuscaloosa, Alabama.

In March 1961 Mrs. Kauchick again became pregnant and saw Dr. McNalley. She visited Dr. McNalley monthly. In July, Dr. McNalley observed that the cervix had begun to dilate. He performed what is known as a Shirodkar operation on July 19. He described the operation as one in which a ribbon is placed around the cervix to prevent dilation. However, the procedure did not succeed and in August another miscarriage occurred.

The record is not entirely clear but either in connection with an examination at that time or subsequently, on September 23, 1961, Dr. McNalley discovered what he described as a "defect in the wall of the uterus which was a scar resulting from a longitudinal incision running superiorly which was made on her uterus during the Caesarean Section operation performed at Normandy Osteopathic Hospital." Dr. McNalley stated that because of the defect in the wall the uterus would not hold a pregnancy. On February 5, 1962, Dr. McNalley performed a surgical repair of the defect. The operation was apparently successful. In November 1964 Dr. McNalley saw Mrs. Kauchick and she was then pregnant. The expected delivery date of the pregnancy was June 27, 1965, but Dr. McNalley elected to deliver the child by Caesarean section on May 17, 1965.

This suit was filed in the St. Louis County Circuit Court on November 28, 1962. By count one of the petition, Mrs. Kauchick sought a judgment for damages against Doctors Williams, Mattison and John Olson. By count two, her husband sought to recover his expenses and damages from the same defendants. Insofar as the matters relied upon on this appeal are concerned, the claim against Dr. Mattison is based on the contention that he erroneously determined from X rays taken by others that Mrs. Kauchick's pelvic measurements were adequate for vaginal delivery and that he approved delivery in that manner. Insofar as Dr. Williams is concerned, the charge was that he failed, during his care of Mrs. Kauchick, to discover her pelvic inadequacy; that because of his failure to use forceps in the attempted delivery, and his delaying the Caesarean procedure after the patient had been in secondary labor for four hours, the child became so deeply placed in the pelvis that when the operation was done a single incision was not adequate to permit the delivery and an additional longitudinal incision was required, which incision produced a weakness in the uterus wall causing three subsequent miscarriages and ultimately requiring operative repair. The claim against Dr. Olson is not pursued

on this appeal and we take no note of the charges as to him.

The trial court sustained the motions of Doctors Mattison and Olson for a directed verdict at the close of plaintiffs' case. Dr. Williams's motion was sustained at the close of all the evidence. The issues presented by the defendants' motions were failure to make a submissible case and the bar of the two-year statute of limitations to the plaintiffs' claims. Those are the issues which have been briefed on this appeal. We find the statute of limitations issue decisive and consider only it.

Mrs. Kauchick contends that the defendants fraudulently concealed their negligent acts and omissions from her with the intention of depriving her of her cause of action, that she did not discover the true facts until August 1961 and, therefore, the statute of limitations was held in abeyance until that time. Her husband contends that his claim is separate and distinct from his wife's and is controlled by the five-year statute of limitations. The defendants contend that the two-year statute applies to both claims, that such period may not be tolled by any alleged improper acts of the defendants, and that, even if it were, plaintiffs have failed to show any improper acts of the defendants.

The general statutes of limitations are found in Chapter 516, RSMo 1959, V.A. M.S. The sections of this chapter provide various periods of limitation for different categories of litigation. The limitation period for malpractice actions is fixed by § 516.140, RSMo 1959, V.A.M.S., which provides in part as follows: "Within two years: An action for libel, slander, assault, battery, false imprisonment or criminal conversation. All actions against physicians, surgeons, dentists, roentgenologists, nurses, hospitals and sanitariums for damages for malpractice, error, or mistake shall be brought within two years from the date of the act of neglect complained of, * * *."

Section 516.280, usually associated with fraudulent concealment and chiefly relied upon by Mrs. Kauchick, reads as follows: "If any person, by absconding or concealing himself, or by any other improper act, prevent the commencement of an action, such action may be commenced within the time herein limited, after the commencement of such action shall have ceased to be so prevented."

The case of Laughlin v. Forgrave, Mo., 432 S.W.2d 308, decided by this court en banc September 9, 1968, involved the tolling of § 516.140 in a malpractice action but did not determine the applicability of § 516.280. The opinion expressly states: "Inasmuch as plaintiff's reliance is solely on § 516.100, we do not consider whether other sections of Chapter 516 may affect the time for filing medical malpractice actions, particularly § 516.280."

Section 516.300 provides: "The provisions of sections 516.010 to 516.370 shall not extend to any action which is or shall be otherwise limited by any statute; but such action shall be brought within the time limited by such statute."

The defendants contend that the two-year malpractice limitation is a limitation "otherwise * * * by any statute" within the meaning of § 516.300 and, therefore, must be looked to solely without regard for tolling statutes such as § 516.280. The Eighth Circuit Court of Appeals in Hellebrand v. Hoctor, 331 F.2d 453, gave support to the position of the defendants here. However, we feel that the Eighth Circuit Court of Appeals did not have the benefit of full exposition of our statutory scheme of limitations and reached an erroneous conclusion. Inasmuch as the problem is essentially one of statutory construction, we look to the statutory history for any light which it might shed on the all-important matter of legislative intent.

The provision for tolling the statute of limitations for wrongful acts has been part

of our statutory scheme since territorial days. It is found in language somewhat different from the present provision in an 1807 act of the Territorial Legislature. 1 Terr.Laws, Ch. 42, pp. 144–145. A similar provision was enacted by the General Assembly in 1825. 2 Laws of Mo., 1825, pp. 510–511. In 1835 the General Assembly enacted a limitation act (RSMo 1835, pp. 392–396) which set the pattern for our present statutory scheme. Limitations for real actions were prescribed in Article I of the act. Personal actions were covered by Article II. Article III contained "General provisions concerning the commencement of suits, * * *." Section 8 of Article III read as follows: "If any person, by absconding or concealing himself, or by any other improper act of his own, prevents the commencement of any action in this act specified, such action may be commenced within the times herein respectively limited after the time the commencement of such action shall have ceased to be so prevented." Section 10 provided: "The provisions of this act shall not extend to any action which is, or shall be, otherwise limited by any statute, but such action shall be brought within the time limited by such statute." Examination of the 1835 statutes reveals several examples of actions "otherwise limited by any statute." Section 21 of an act on "Boats and Vessels". (RSMo 1835, pp. 102, 104) required actions against a boat or vessel under such act to be brought within six months. Section 9 of an act relating to "Notaries Public" (RSMo 1835, pp. 417–418) limited the bringing of actions against a notary or his securities to three years. (See section 486.050, RSMo 1959, V.A. M.S.; State ex rel. State Life Ins. Co. v. Faucett, et al., Mo., 163 S.W.2d 592; Kohout v. Adler, Mo.App., 327 S.W.2d 492.) Section 16 of an act relating to "Wills" (RSMo 1835, pp. 616–621) set a five-year limitation for the contest of wills.

An 1857 act (Laws of Mo., 1856–1857, pp. 76–81) reenacted a limitations article following the pattern of the 1835 act. Section 5 of Article II of that act (Id., p. 78) fixed a two-year limitation for "an action for libel, slander, assault, battery, false imprisonment, or criminal conversation; * * *." Section 8 of Article III of the act contained the "improper act" tolling provision in the language of the 1835 act, and § 10 excluded actions otherwise limited.

The now § 516.280 appeared in its present form as § 24 of Chapter 191 of the 1865 General Statutes (p. 748). With minor changes, the 1865 provisions were carried forward in the subsequent revisions. In the 1919 revision, the limitation provisions were found in Articles VIII and IX of Chapter 12, the Code of Civil Procedure. Section 1334 in Article IX contained the wrongful act tolling provision and § 1336 excluded application of "the provisions of articles 8 and 9 of this chapter" to actions otherwise limited by statute.

In this background the malpractice limitation was enacted in 1921. Laws of Mo., 1921, p. 197. Section 1 of the act read: "Amending article IX, chapter 12; that article IX, chapter 12, of the Revised Statutes of Missouri, 1919, be and the same is hereby amended by adding a new section thereto, to be known as section 1319a, to read as follows:" There followed § 1319a enacting the two-year limitation now found in § 516.140. In the 1929 revision, the two-year malpractice limitation was combined in § 864 with the two-year period for libel, etc.

The significance of this legislative history is that it shows a long-standing legislative practice of treating separately limitations fixed by the general limitation statutes and those otherwise provided by statute. When the two-year malpractice limitation was enacted, the legislature quite clearly and presumably deliberately placed it in the general limitation article. In so doing the legislature must be charged with knowledge of the distinction theretofore established by the legislation and recognized by the courts (Gerren v. Hannibal & St. Joseph R. R. Co., 60 Mo. 405, 411; State ex rel.

Barringer v. Hawkins, 103 Mo.App. 251, 77 S.W. 98), between statutes of limitation found in the general statutory chapter on such subject and periods of limitation otherwise provided. The legislative treatment of this distinction and its clear recognition in the enactment of the malpractice limitation refutes the defendants' contention that § 516.300 renders § 516.280 inapplicable to malpractice actions.

Inasmuch as plaintiff's chief reliance is on § 516.280, we do not here consider what other provisions of Chapter 516 might affect the time for filing malpractice actions. Nor do we need to attempt to enumerate the "otherwise limited" actions to which § 516.300 refers. However, the cases of State ex rel. Bier v. Bigger, 352 Mo. 502, 178 S.W.2d 347, and Frazee v. Partney, Mo., 314 S.W.2d 915, relied upon by the Eighth Circuit Court of Appeals in Hellebrand, supra, clearly involved limitations prescribed by other than the general statutes. Bigger involved the one-year limitation on the probate of wills, which is outside the general limitation statutes. See § 473.050, RSMo 1959, V.A.M.S., part of the Probate Code. Frazee involved the wrongful death act. The act creating that cause of action fixes the time within which it must be brought. Section 537.100, RSMo 1959, V.A.M.S. Reading of that section shows that the general assembly has enacted tolling provisions particularly applicable to such causes of action.

The defendants also cite and rely upon National Credit Associates, Inc. v. Tinker, Mo.App., 401 S.W.2d 954. In that case the court did quote, with approval, the conclusion of the Eighth Circuit Court of Appeals in Hellebrand (401 S.W.2d l. c. 958). However, the question in the Tinker case was whether or not the cause of action attempted to be stated by way of counterclaim was one for fraud or one for malpractice. The actual holding in Tinker is that the case was one for malpractice and, therefore, the five-year fraud statute did not apply. Fraudu-

lent concealment was not actually the defense offered against application of the malpractice limitation.

■ We, therefore, conclude that § 516.280 does apply in malpractice actions. The parties to this appeal do not dispute that fraudulent concealment is a wrongful act within the meaning of § 516.280. See State ex rel. Bell v. Yates, 231 Mo. 276, 132 S.W. 672, 674 [6, 7]. However, the question remains whether or not in this case there was evidence presented which would authorize finding that the defendants had wrongfully concealed from Mrs. Kauchick their allegedly negligent acts.

In the appellants' brief, the plaintiffs' theory is stated as follows: "The 'improper acts' consist of Respondents' concealment of their negligence from Appellants. Respondent Mattison published both X-ray reports set out in Appellants' Exhibit One which recommended pursuance of vaginal delivery. Respondent Williams assisted at the Caesarean section operation during which he observed the conditions necessitating the additional longitudinal incision. Respondent Mattison was aware of his incorrect measurements and negligence because he was called upon to take X-rays of Mrs. Kauchick after delivery by Caesarean section operation, thereby affording him with knowledge of his inaccuracies in recommending vaginal delivery which could not be accomplished. Respondent Williams was aware of his negligence because he personally observed the deep emplacement of the fetal skull in the birth canal which caused the second incision constituting the defect in her uterus. Yet, both Respondents remained silent, did not divulge their knowledge to Appellants, and Respondent Williams affirmatively disclaimed knowledge of any negligent acts which caused any injury to Mrs. Kauchick's uterus. He even went so far as to lull her into a fictitious sense of security that she would have no difficulties from the Caesarean section with her future pregnancies."

This position obviously gives rise to the question of what constitutes fraudulent concealment within the rule which plaintiff seeks to apply. In the case of Doctor Mattison, the reliance is completely upon his failure to disclose to Mrs. Kauchick his alleged error in reading the X rays. Some of our cases do state that mere silence on a defendant's part does not amount to fraudulent concealment which tolls the statute (Gilliam v. Gohn, Mo., 303 S.W.2d 101, 107 [6–10]; Maynard v. Doe Run Lead Co., 305 Mo. 356, 265 S.W. 94, 99 [7]). Other cases recognize that silence may amount to fraud where there is a duty to speak. Wheeler v. Missouri Pacific R. Co., 328 Mo. 888, 42 S.W.2d 579, 583 [6–8]. "[B]ecause of the relationship of trust and confidence existing between a practitioner and his patient and the former's corresponding duty to disclose material information to the latter, mere silence and failure to disclose to the patient the fact of the injury done to him may constitute fraudulent concealment of a cause of action for malpractice such as will toll the statute of limitations." Annotation, Statute of Limitations, Malpractice, 80 A.L.R.2d 368, 408.

In Eschenbacher v. Hier, 363 Mich. 676, 110 N.W.2d 731, 732–733, the court stated: "* * * In malpractice actions against doctors, the law is, and has been at least since the Groendal case, that a higher standard is applied in determining whether a doctor fraudulently concealed a cause of action from a patient than is applied where fraudulent concealment is alleged in cases between two corporations or two businessmen dealing at arm's length. The law does critically examine the relationship between patient and doctor, the disparities between them in knowledge and experience and the reliance placed upon the doctor by the patient in determining whether there has been fraudulent concealment of a cause of action. Such factors must be considered before the Court can determine that the doctor made sufficient disclosure of the facts to his patient, in meaningful language, or that what he did say, the manner in which

he said it, or what he failed to say, constitutes fraudulent concealment." See also Adams v. Ison (Ky.), 249 S.W.2d 791.

■ A necessary predicate of the duty under such rule is knowledge on the part of the physician "of the fact of the wrong done to the patient." 80 A.L.R.2d 407. See Brown v. Grinstead, 212 Mo.App. 533, 252 S.W. 973, 974 [1]; Carter v. Harlan Hospital Ass'n, Inc., 265 Ky. 452, 97 S.W.2d 9, 10; Albert v. Sherman, 167 Tenn. 133, 67 S.W.2d 140, 141 [1]; Maloney v. Brackett, 275 Mass. 479, 176 N.E. 604, 607. Here, there was no evidence that Dr. Mattison was aware of matters which would require him to make a disclosure to Mrs. Kauchick. The negligence charged against him was his erroneous computation from the X rays of the intertuberous space. However, nothing further was produced other than his X-ray reports and the subsequent measurements by Dr. McNalley which disclosed the error in Dr. Mattison's reading. Mrs. Kauchick testified that X rays were taken but made no mention of Dr. Mattison by name. He, in fact, testified that he never saw Mrs. Kauchick; that he merely examined and reported upon the X ray pictures made by another physician at the hospital. Mrs. Kauchick would infer that Dr. Mattison became aware of his error because "he was called upon to take X rays of Mrs. Kauchick after delivery by Caesarean section * * *." The evidence did not show that Dr. Mattison *took* such X rays. In any event, Dr. Mattison's knowledge of the Caesarean would not require the inference that his X-ray computation had been erroneous and that he had knowledge thereof. We do not consider the circumstances relied upon sufficient to permit a finding that Dr. Mattison had the requisite knowledge which would impose upon him a duty to speak.

Mrs. Kauchick testified that she did talk with Dr. Williams following the delivery of the child. However, we do not find support for plaintiffs' conclusion that Dr. Williams lulled Mrs. Kauchick "into a

fictitious sense of security that she would have no difficulties from the Caesarean section with her future pregnancies." All that Mrs. Kauchick testified was that Dr. Williams told her that she could have other children. Mrs. Kauchick stated: "I don't remember him telling me that I would have to have a Caesarean section again * * *. I didn't believe I would have to have a Caesarean section again. I didn't know one way or the other, he didn't say, I don't believe I asked him that." The claim of fraudulent concealment against Dr. Williams is based on his failure to advise Mrs. Kauchick as to what made the Caesarean operation necessary and his statement, as testified to by Mrs. Kauchick, that he did not know what caused her difficulty.

Again the difficulty with Mrs. Kauchick's position is that there is no evidence to support the finding that Dr. Williams did know what actually caused her difficulty. He testified that he relied upon the X-ray report that her pelvic measurement would permit vaginal delivery. Mrs. Kauchick's expert medical testimony might support a finding that Dr. Williams's reliance upon the X rays and his failure to make a clinical measurement were not in accord with the generally accepted medical practice in the community at the time. However, that would not establish that Dr. Williams was aware that he had been negligent and that, in telling Mrs. Kauchick that he did not know what caused her difficulty, he was endeavoring to conceal his negligence from her in order to avoid an action for malpractice.

The burden was upon this plaintiff to establish the facts to support a claim of fraudulent concealment. Central Bank of Kansas City v. Thayer, 184 Mo. 61, 82 S. W. 142, 151; Beard v. Citizens' Bank of Memphis, Mo.App., 37 S.W.2d 678, 680 [4]. She failed to sustain her burden and the trial court properly concluded that her cause of action was barred by limitation.

The alleged negligent acts and malpractice of the defendants are the basis of the husband's claim. This fact cannot be altered by his contention that the five-year statute of limitations applies to his claim rather than the two-year malpractice act. The husband's cause of action is merely for a different item of damage for such wrongful acts, the resultant damage to the husband for the wrong done to his wife. The wrong charged remains malpractice and § 516.140 is applicable. Baysinger v. Hanser, 355 Mo. 1042, 199 S.W.2d 644. See Barnhoff v. Aldridge, 327 Mo. 767, 38 S.W. 2d 1029; Gerba v. Neurological Hospital Association, Mo., 416 S.W.2d 126; Cramer v. Price, 84 OhioApp. 255, 82 N.E.2d 874.

The judgment is affirmed.

HOLMAN, C. J., HENLEY and DONNELLY, JJ., and ANDERSON, Special Judge, concur.

FINCH, J., concurs in result in separate concurring opinion filed.

EAGER, J., concurs in result and concurs in separate concurring opinion of FINCH, J.

SEILER, J., not sitting.

FINCH, Judge (concurring).

I concur in the result reached in the principal opinion and in what is said therein except language indicating that mere silence on the part of the physician may constitute a wrongful act under § 516.280, RSMo 1959, V.A.M.S., which will toll the application of the limitation provisions of § 516.140. I have set out in a concurring opinion in Smile v. Lawson, Mo., 435 S.W.2d 325 decided concurrently herewith, the reasons why I do not agree with this portion of the principal opinion. It would serve no useful purpose to restate those views herein.