333 So.2d 25 (1976)
Nicholas NARDONE, an Infant by His Father and Next Friend Nicholas H. Nardone, and Nicholas H. Nardone, Individually, Appellants,
v.
David H. REYNOLDS et al., Appellees.
No. 47109.
Supreme Court of Florida.
May 19, 1976.
*27 Abraham H. Shukat, Miami Beach, Alfred S. Julien and David Jaroslawicz, New York City, for appellants.
S.O. Carson and Edward J. Atkins, of Walton, Lantaff, Schroeder, Carson & Wahl, James E. Tribble of Blackwell, Walker, Gray, Powers, Flick & Hoehl, Henry Burnett of Fowler, White, Burnett, Hurley, Banick & Knight, and Steven R. Berger of Carey, Dwyer, Austin, Cole & Selwood, Miami, for appellees.
ROBERTS, Justice.
Pursuant to Rule 4.61, Florida Appellate Rules and Section 25.031, Florida Statutes, this cause is before us on certificate from the United States Court of Appeals, Fifth Circuit, in an appeal from the decision of the United States District Court, Southern District of Florida, which held that the malpractice action instituted by appellants in 1971, was barred by the Statute of Limitations and, accordingly, granted the motions for summary judgments of the several defendants-appellees. The following questions have been certified to us based upon the following recited facts:
"I. In a medical malpractice case does the period of limitation (F.S.A. 95.11(4)) commence:
(a) As to the parents and legal guardians of the incompetent minor in their own right
(b) As to the parents and legal guardians of the incompetent minor as next friends in behalf of the minor
(c) As to the incompetent minor in his own right when the parents and legal guardians of the incompetent minor have (i) knowledge of the physical condition and the drastic change therein during the course of medical treatment, but (ii) do not then have (or are not charged with having) knowledge that such physical-mental condition was caused in whole or in part by acts or non-acts of the alleged malpractitioners?
II. Is knowledge of the contents of the medical doctor, hospital, etc. records concerning the incompetent minor patient which are of a character as to be obtainable by, or available to, the patient (or guardian) but the contents of which are actually not known, imputed to:
(a) The parents and legal guardians of the incompetent minor in their own right?
(b) The parents and legal guardians of the incompetent minor as next friends in behalf of the minor?
(c) The incompetent minor in his own right?
III. Under the Florida doctrine of tolling limitations by fraudulent concealment, where there is knowledge by the parents *28 of the incompetent minor of the physical-mental condition but not the cause as set forth in I above, does non-disclosure by one or more of the alleged malpractitioners of possible causes of the such condition unaccompanied by mispresentation toll the statute:
(a) as to all of the alleged malpractitioners?
(b) as to individual alleged malpractitioners who did not participate in the asserted `concealment'?
IV. Where there is knowledge by the parents as set out in I and III above but no request by them for such information did the alleged malpractitioners, each considered individually, have:
(a) a duty to make disclosure to the parents of the records and the essential, material significant facts relating to possible or likely causes of the minor patient's condition and change therein?
(b) If the answer to (a) is `yes' what is the consequence if any on the statute of limitations?"
Following an evaluation by Dr. Chiles, an eye specialist, Nicholas Nardone, age 13, who had been experiencing difficulty with coordination, blurred vision, dyplopia and headaches, was admitted to Jackson Memorial Hospital in January, 1965, where he underwent four brain operations in January, February, and March, and various diagnostic procedures. After initial evaluation by Dr. Chiles, he was transferred to the care of appellee, Dr. Reynolds, who, after examination of Nicholas, performed an exploratory craniotomy on January 26, 1965, and finding an obstruction of the sylvius aqueduct, inserted a Torkildsen tube (shunt), designed to by-pass the aqueduct and to permit the flow of spinal fluid between the ventricles of the child's brain into the right side of the child's head. Following this surgery and insertion of the tube for a period of two weeks, Nicholas suffered from Tachypnea, tachycardia, respiration difficulty, increased intracranial pressure, high temperatures, symptoms of subdural hemorrhaging, symptoms of hypoxia, bilateral facial paresis, restlessness, irritability, abnormal protein level, "white blood cell count level, blood in the cerebrospinal fluid, periods of increased blood pressure and tremors." In Dr. Reynold's absence, the hospital called in Dr. Sheffel to assist in observation of the child's post-operative progress. On February 12, 1965, Dr. Sheffel replaced the Torkildsen tube installed by Dr. Reynolds with a ventriculoatrial shunt, an operation performed without the presence of Dr. Reynolds, and during this operation, evacuated a copious amount of Xantho chronic fluid beneath the subdural membrane which had been exerting pressure on the infant's brain. Following this procedure, there was an encouraging, marked, and steadily progressive improvement in his condition. His progress was such that on February 22, his birthday, his mother was told that he would be able to go home in two weeks when he could have his birthday party. The shunt inserted by Dr. Sheffel was operating properly at this time.
Although apparently unclear from the record, briefs and oral argument, Reynolds, Sheffel or both permitted a pantopaque ventriculogram, a diagnostic procedure wherein dye is introduced into the ventricles of the brain, to be performed on the child on February 25, 1965, which procedure, appellants contend is contrary to proper procedure when there is a shunt, and which procedure appellants contend was negligently performed. None of the Appellees-defendants admit to performing this procedure although the hospital record on the report of radiological consultation dated February 25, 1965, is signed by defendant Gargano, a radiologist employed by Jackson Memorial Hospital. The hospital records pertaining to the pantopaque ventriculogram notes that some of the pantopaque entered the shunt tube and veins of Nicholas' neck. Appellants contend that Dr. Gargano conceded that retention of the dye in the shunt *29 rendered it non-functional and Dr. Sheffel testified that one of the objectives of maintenance of a shunt is to see that it does not become obstructed. After the PPV procedure, the child's condition worsened.
From February 25 to March 6, 1965, he exhibited symptoms of subdural pressure, suffered from constant headaches, was difficult to arouse, stopped talking, was drowsy and incoherent, had spiking temperatures and experienced projectile vomiting. On March 7, he could not be aroused, and in an effort to relieve brain pressure, Dr. Sheffel performed an emergency operation evacuating 250-300 ccs of yellow subdural fluid and, at this time, clamped off the shunt. After the operation Nicholas remained in a comatose state. Further surgery was performed by Dr. Reynolds on March 15, 1965, following which the patient did not improve but rather remained in a vegetative condition.
Upon discharge from the hospital in July 1965, the child's condition was comatose, totally blind. He had suffered irreversible brain damage.
The parents were told and knew that this was the infant's condition prior to his discharge  totally blind, no longer able to walk and beyond help or hope of recovery  although they were not specifically told of the pantopaque ventriculogram or the possible causes of the son's ultimate condition.
The parents testified that they were not told that the PPV would be administered, that they never heard the term, and that no one at the hospital told them that it had been performed; and testified that as to the cause of the boy's condition, they were told that these things happen. None of the physicians sought to disclose the course of treatment to the parents although apparently not requested by them to do so.
After discharge, Nicholas was taken to the family's temporary home in Hollywood, Florida, where he was under the care of Dr. Dobbrunz (not a party to the suit). Following discharge from the hospital in July, 1965, none of the defendants had any further contact with the child.
With one exception, to be explained below, no request for records, charts, or information pertaining to the child's hospitalization was ever directed to any of the defendants. Records were available from the hospital at all times upon request.
In September, 1965, Nicholas was admitted to the Columbia Presbyterian Hospital, New York (hereinafter referred to as Columbia) for evaluation where he remained under the care of neuro-surgeons until discharge on October 19, 1965. The physicians at Columbia requested the hospital record from Jackson Memorial Hospital. Appellants contend that Jackson Memorial sent excerpts of the record consisting of the discharge summary, operative reports of January 26th, and March 15, 1965, a radiological report dated November 24, 1965, which contained references to a January 21, 1965, skull film, a neuro-encephalogram dated January 26, 1965, and several anteriograms, and contend that the records not sent to Columbia included records of February 12, 1965, and March 7, 1965, relating to surgery performed by Dr. Sheffel, radiological consultations including the PPV, the doctors' orders, progress records, and nurses' notes.
Upon examination and consideration of the supplied records, Dr. Vicale of Columbia stated in his final diagnosis and report, as follows:
"Patient in decerebrate state on admission characterized by bilateral hemiplegia with typical tonic decerebrate spasms of the limbs and trunk. On admission both pupils were highly dilated and fixed and both optic nerve heads showed profound secondary optic atrophy. Patient had been in this state since mid March. This condition developed in the early part of March as a result of bilateral subdural hematomas that arose as a complication of a ventriculoatrial shunt done on 2/12/65 at the Jackson Memorial Hospital *30 for the relief of obstructive hydrocephalus owing to stenosis of the cerebral aqueduct (probably of ten years duration at least).
"All of the record, all of the films of the various x-ray studies carried out have been reviewed by Dr. Ernest Wood, Dr. Lester Mount, and myself and it is certain that the brain damage responsible for the decerebrate state is irreversible and that he has bilateral total blindness. The family has been advised against subjecting him to any further diagnostic or therapeutic procedures and to transfer him to a nursing home for further care.
"Final Diagnosis: Decerebrate state  mesencephalic and decorticate types combined  secondary to uncal herniation from bilateral subdural hematomas secondary to ventriculoatrial shunt for obstructive hydrocephalus owing to aqueduct stenosis (of 10 years or more duration)."
At all times, the records of Columbia were available to appellants from either Columbia or Dr. Cocco to whom a copy was sent in October, 1965, but appellants made no request for the same.
In March 1969, Mrs. Nardone called Dr. Reynolds by long distance telephone from their permanent home in Kearny, New Jersey, and asked him to send "the records" for use by a rehabilitation center. Dr. Reynolds sent records including the radiological report of the pantopaque ventriculogram. Mrs. Nardone gave the material to her husband who testified that "the institute is located in Philadelphia and I didn't think it merited any purpose in him going there," and that he "just kept" the records and finally brought them over to my lawyers in 1971.
Dr. Cocco visited the child in Jackson Memorial Hospital once in January 1965 and had access to such of the medical charts as he desired to see. He never was refused any records. In October, 1969, Dr. Cocco, referring to the Vicale report commented to Mr. Nardone that "it was unfortunate the way things worked out in the (Jackson Memorial) hospital".
The boy's condition never changed or improved after his discharge from Jackson Memorial Hospital in July 1965.
The evidence is without dispute that the plaintiffs retained only Dr. Reynolds to diagnose and/or treat the minor. Dr. Sheffel was a professor of neurosurgery at the University of Miami and member of the staff at Jackson Memorial Hospital. By virtue of that position, he came into contact with the patient. During the course of the boy's hospitalization, Dr. Sheffel performed the second and third of four surgical procedures. The fourth operation was a 3:00 a.m. emergency performed by Dr. Sheffel when called to the hospital by a resident. In both cases, Dr. Reynolds was absent or unavailable.
Either Dr. Sheffel or Dr. Reynolds or both referred the parents to a Dr. Dobbrunz in Hollywood, Florida, upon the boy's discharge from the hospital and there was no relationship or contact between Dr. Sheffel and the plaintiffs at any time after the hospitalization until the suit was filed. The original complaint was filed in May 1971, but Dr. Sheffel was not named in that complaint and was not added as a party defendant until nearly one-half year later.
The depositions of Mr. and Mrs. Nardone establish, without dispute, that they never heard the name Dr. Gargano until the day their depositions were taken on November 11, 1971. They also testified that they never met or corresponded with him at any time. Furthermore, there was never any communication with Dr. Gargano through any other person, and there was total lack of contact with him to elicit any information or to make any requests of him. Dr. Gargano's testimony, that he has never performed a ventriculogram or put pantopaque in the brain is undisputed.
This action was commenced by the filing of the complaint in May 1971, more than five years after the infant's discharge from *31 Jackson Memorial Hospital when his condition was as described above.
This action was brought in the United States District Court, Southern District of Florida, by Nicholas Nardone, an infant by his father and next friend Nicholas H. Nardone and Nicholas H. Nardone, individually. In substance it charged malpractice and concealment against Dr. David Reynolds and Dr. Donald Sheffel, as the surgeons performing the surgical operation and diagnostic procedures, Dr. Freddie Gargano, as radiologist, and Dade County, Florida, as operator of Jackson Memorial Hospital. Their respective insurers were also named as defendants.
All of the defendants affirmatively pleaded the statute of limitations and, after several depositions were taken, moved for summary judgment on that basis.
At a preliminary Pre-Trial conference held March 1, 1972, the Court required the plaintiffs within ten days to file a specific factual statement of the specific charges against each individual defendant, including the alleged acts of concealment. Defendants contend that plaintiffs' response made no reference to any act of concealment on the part of any defendant-appellee.
An evidentiary hearing on the question of fraudulent concealment and the application or non-application or the tolling of the statute of limitations was likewise held for the express purpose of receiving evidence in opposition to the pending motions for Summary Judgment. Except for introducing exhibits and the pre-trial depositions, no further testimony was submitted by the plaintiffs.
Thereafter, the District Judge entered the final Summary Judgment sustaining the defense of the statute of limitations.
The United States District Court, Southern District of Florida, concluded that this action was barred by the statute of limitations since the injuries had occurred, and their existence was apparent and obvious, in 1965, and at all times thereafter; that all relationships between the plaintiffs and their son and the several defendants-appellees were terminated in 1965; that there was not and by the nature of things, there could not have been a concealment of the infant's condition by any of the defendants because his condition was patent, obvious, and known to have culminated during the period in which the child was hospitalized; that there was no fraudulent concealment of any known cause of the infant's condition; and that plaintiffs seek now to make use of information that at all times has been available to them had they used due diligence. The District Judge found that, assuming arguendo the relevancy of information relating to the cause as opposed to the condition, the record is devoid of any concealment by any defendant from the plaintiffs of information or facts relating to the causes of such condition as alleged.
On appeal of the summary judgment, the United States Circuit Court of Appeals, Fifth Circuit, determining that the propositions posited by the appeal present questions of gravest public policy to Florida, has certified the above delineated questions to us for our resolution.
Initially as appears from the record, the findings of the United States District Court, and statement of facts in the certificate before us, we reiterate that although the infant's condition wavered during hospitalization, before discharge, he was totally blind and had suffered irreversible brain damage. His parents were told and knew that this was their son's condition prior to his discharge from the hospital in July, 1965. Furthermore, Dr. Vicale's report and final diagnosis dated October, 1965, explained the irreversible nature of the brain damage and described the child's condition in detail. Unquestionably, the appellants-plaintiffs below were aware of the extent of the injury in 1965. Dr. Vicale's report was readily available at all times. But suit was not commenced until more than five years after the child's discharge from *32 the hospital. At the time of commencement of this suit by filing of a complaint in May 1971, the applicable statute of limitations, Section 95.11(4),[1] provided that this action be brought within four years.
Appellants request that this Court adopt the view that the statute of limitations did not commence to run until they became aware of the negligence of the physicians and hospital. Previously, this Court has held that the statute of limitations in a malpractice suit commences either when the plaintiff has notice of the negligent act giving rise to the cause of action or when the plaintiff has notice of the physical injury which is the consequence of the negligent act. City of Miami v. Brooks, 70 So.2d 306 (Fla. 1954). Sub judice, the plaintiffs were on actual notice of the decerebrate state of their son, that he had suffered irreversible brain damage, and in accordance with Brooks, supra, the statute of limitations began to run when the injury was known. Plaintiff in Brooks, supra, while a patient at Jackson Memorial Hospital in April, 1944, received an overdose of x-ray therapy treatment for the removal of plantar warts from her foot. However, it was not until August, 1949, that she was advised and first became aware that her heel had been injured by the x-ray therapy treatment received in 1944. No prior indication of the injury was evidenced before 1949, when a sore developed which turned into an ulcer, but in fact the heel gave every appearance of being healthy and in good condition prior thereto. Recognizing that at the time of the application of the x-ray treatment, there was nothing to put the plaintiff on notice of any probable or even possible injury, this Court espoused the general rule to be:
"... that where an injury, although slight, is sustained in consequence of the wrongful act of another, and the law affords a remedy therefor, the statute of limitations attaches at once. It is not material that all the damages resulting from the act shall have been sustained at that time and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date. 34 Am.Jur. 126, Sec. 160, Limitation of Actions.
"This rule was applied by this Court in the case of Cristiana [Cristiani] v. City of Sarasota, 65 So.2d 878, which case is relied upon strongly by the appellant. In that case a servant of the city, acting within the scope of his employment, carelessly and negligently backed a truck of the city against the tricycle of a minor child, causing him to be thrown to the ground, sustaining violent blows on his *33 head and body, which resulted in blindness of the right eye and which was not discovered until about eighteen months thereafter. The suit was held to have been barred by the statute of limitations, F.S. 95.24, F.S.A., which provides:
"`No action shall be brought against any city or village for any negligent or wrongful injury or damage to person or property unless brought within twelve months from the time of the injury or damages.'
"The Court held the running of the statute not to be postponed, even though the injury did not materialize and was not discovered until later. There is a distinction, however, between notice of the negligent act and notice of its consequences. In the case of Cristiani v. City of Sarasota, while there was no notice of the consequences of the act until eighteen months later, nevertheless, there was notice of the act at the time of the accident and of a right of a cause of action, so that the statute began to run even though notice of its consequences did not materialize until later."
In Buck v. Mouradian, 100 So.2d 70 (Fla.App.3, 1958), cert. den. Fla., 104 So.2d 592, wherein plaintiff brought a malpractice action against a physician for injuries allegedly caused by the administering of x-ray treatments, the court concluded:
"From an examination of the pleadings, interrogatories and appellant's admissions, it conclusively appears that she was aware of her injury in 1951 shortly after the treatments administered by the appellee. Her admissions and responses to the appellee's requests affirmatively established the knowledge on her part of her injury. It is true that the appellant has complained of the appellee's fraudulent concealment of his negligent act that caused the injury and the true extent of such injury, but nowhere have we been able to find that she was without knowledge of her injury at the time, or shortly thereafter, of the administration of the x-ray treatments. On the contrary, her admissions establish her knowledge."
This Court in Cristiani v. City of Sarasota, 65 So.2d 878, 879 (Fla. 1953), a personal injury action based on the wrongful or negligent act of another, relied on in Brooks, supra, and Buck, supra, opined:
"The general rule seems to be that actions for personal injury based on the wrongful or negligent act of another accrue at the time of the injury and that the statute of limitations begins to run at the same time. The running of the statute is not postponed even though the injury may not materialize or be discovered till later."
The severe nature of Nicholas' injury was readily apparent in 1965 before his discharge and was reaffirmed by Dr. Vicale in October, 1965, who stated in his report that the family has been advised against subjecting him to any further diagnostic or therapeutic procedures and to transfer him to a nursing home for further care. We agree with the United States District Court that since in 1965 the nature of the child's condition was obvious and known to the plaintiffs, it was then that the cause of action accrued and the statute of limitations commenced to run as to the parents and legal guardians of the incompetent minor in their own right, as to the parents and legal guardians of the minor as next friends in behalf of the minor, and as to the incompetent minor in his own behalf. Readily evidenced by the record, there could be no concealment and was none of the infant's obvious condition. Cf. Buck v. Mouradian, supra,[2]Slaughter v. Tyler, *34 126 Fla. 515, 171 So. 321 (1936), Gasparro v. Horner, 245 So.2d 901 (Fla.App.4, 1971), Manning v. Serrano, 97 So.2d 688 (Fla. 1957), Brown, et al. v. United States, 353 F.2d 578 (9th Cir.1965).
With the knowledge of the severity of their son's resultant condition, the parents through the exercise of reasonable diligence were on notice of the possible invasion of their legal rights. Notice of the consequences of the physician's acts, assuming arguendo that they were negligent, occurred in 1965. The District Court of Appeal in Vilord v. Jenkins, 226 So.2d 245 (Fla.App.2, 1969), a malpractice action for the negligent performance of a female sterilization procedure wherein the plaintiff became pregnant five years later, held:
"As to the negligence count, the law in this state is that a statute of limitations begins to run when there has been notice of invasion of the legal rights of the plaintiff, i.e., when he has been put on notice of his right of action. In City of Miami v. Brooks, the plaintiff underwent x-ray therapy which, it was said, was negligently administered in 1944. It wasn't until 1949 that resulting x-ray burns became apparent for the first time. Recognizing the general rule that when there is notice of the negligent act the statute begins to run even if its full consequences are not known, the court went further and held that even though there is notice of the act itself, if its negligent character cannot become known until its consequences become apparent, then the statute does not begin to run until notice of the consequences." (e.s.)
In response to the second question, under the peculiar facts of this case, we find that knowledge of the medical, doctor, hospital, etc. records concerning the incompetent minor patient which are of a character as to be obtainable by, or available to, the patient but the contents of which are not known should be imputed to the parents, etc. The following passage from C.J.S. pertaining to ignorance and concealment of causes of action was quoted with approval by this Court in Franklin Life Ins. Co. v. Tharpe, 131 Fla. 213, 179 So. 406 (1938), and subsequently cited by the District Court of Appeal in Houston, et al. v. Florida Georgia Television Company, 192 So.2d 540 (Fla.App.1, 1966):
"Ignorance and Concealment of Causes of Action  a. Ignorance in General. Omitting at this place any consideration of the effect of a mistake, trust relations in general, or laches, and except where there has been secret fraud or fraudulent concealment on the part of the defendant, the rule is generally established that mere ignorance of the facts which constitute the cause of action will not postpone the operation of the statute of limitations, but the statutes will run from the time the cause of action first accrues notwithstanding such ignorance. The reason of the rule seems to be that in such cases ignorance is the result of want of diligence and the party cannot thus take advantage of his own fault."
The means of knowledge are the same as knowledge itself. Scroggin Farms Corp. v. McFadden, 165 F.2d 10, 18 (8th Cir.1948). Relative to the doctrine of federal fraudulent concealment although pertinent here to the issue of imputation of knowledge of the contents of the accessible medical reports, the United States Court of Appeals, Seventh Circuit, opined in Morgan *35 v. Koch, et al., 419 F.2d 993 (7th Cir.1969), that,
"In addition, the statute is tolled only for those who remained ignorant through no fault of their own. Unawareness of facts or law, alone, does not justify suspending the operation of the statute. Tinkoff v. United States, 211 F.2d 890 (7th Cir.1954); Laundry Equipment Sales Corp. v. Borg-Warner Corp., 334 F.2d 788 (7th Cir.1964). The party seeking protection under this doctrine must have exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud. Cf. United States v. Diamond Coal & Coke Co., 255 U.S. 323, 41 S.Ct. 335, 65 L.Ed. 660; Tobacco and Allied Stocks, Inc. v. Transamerica Corp., 244 F.2d 902 (3d Cir.1957). The plaintiff's indifference to the true facts of the case is not enough to toll the statute. Under the circumstances of this case and considering the relationship between the various parties, the nature of the fraud alleged, and the subsequent actions of defendants, we agree with the district court that plaintiff failed to show due diligence on her part."
Cf. 21 Fla.Jur., Limitation of Actions, Section 37, stating in part, "But mere ignorance of the facts which constitute the cause of action will not postpone the operation of the statute of limitations, where such ignorance is due to want of diligence; a party cannot thus take advantage of his own fault."
Finally, the United States Circuit Court inquires as to whether, under the doctrine of tolling the statute of limitations, where there is knowledge by the parents of their son's physical-mental condition but not the cause, nondisclosure of the cause unaccompanied by misrepresentation tolls the statute and whether the alleged malpractitioners had a duty to disclose the possible causes of the injury where there is no request by the parents for such information and where the parents are fully cognizant of the extent of the injuries. It is undisputed that defendants did not engage in conduct of any nature which had the effect of hindering plaintiff from consulting other physicians, or the hospital records or from becoming aware of the facts so as to prevent them from bringing an action. There was no affirmative misrepresentation to the appellants as to the cause of the infant's condition. Dr. Sheffel, citing Kauchick v. Williams, 435 S.W.2d 342 (Mo. 1968), posits that concealment is only that which relates to facts known to the defendant as opposed to mere conjecture or opinion. In Kauchick v. Williams, supra, a malpractice action, the court determined:
"A necessary predicate of the duty under such rule is knowledge on the part of the physician `of the fact of the wrong done to the patient.' 80 A.L.R.2d 407. See Brown v. Grinstead, 212 Mo. App. 533, 252 S.W. 973, 974[1]; Carter v. Harlan Hospital Ass'n., Inc., 265 Ky. 452, 97 S.W.2d 9, 10; Albert v. Sherman, 167 Tenn. 133, 67 S.W.2d 140, 141[1]; Maloney v. Brackett, 275 Mass. 479, 176 N.E. 604, 607. Here, there was no evidence that Dr. Mattison was aware of matters which would require him to make a disclosure to Mrs. Kauchick. The negligence charged against him was his erroneous computation from the X-rays of the intertuberous space. However, nothing further was produced other than his X-ray reports and the subsequent measurements by Dr. McNalley which disclosed the error in Dr. Mattison's reading. Mrs. Kauchick testified that X-rays were taken but made no mention of Dr. Mattison by name. He, in fact, testified that he never saw Mrs. Kauchick; that he merely examined and reported upon the X-ray pictures made by another physician at the hospital. Mrs. Kauchick would infer that Dr. Mattison became aware of his error because `he was called upon to take X-rays of Mrs. Kauchick after delivery by Caesarean section * * *.' The evidence did not show *36 that Dr. Mattison took such X-rays. In any event, Dr. Mattison's knowledge of the Caesarean would not require the inference that his X-ray computation had been erroneous and that he had knowledge thereof. We do not consider the circumstances relied upon sufficient to permit a finding that Dr. Mattison had the requisite knowledge which would impose upon him a duty to speak.
"Mrs. Kauchick testified that she did talk with Dr. Williams following the delivery of the child. However, we do not find support for plaintiffs' conclusion that Dr. Williams lulled Mrs. Kauchick `into a fictitious sense of security that she would have no difficulties from the Caesarean section with her future pregnancies.' All that Mrs. Kauchick testified was that Dr. Williams told her that she could have other children. Mrs. Kauchick stated: `I don't remember him telling me that I would have to have a Caesarean section again * * *. I didn't believe I would have to have a Caesarean section again. I didn't know one way or the other, he didn't say, I don't believe I asked him that.' The claim of fraudulent concealment against Dr. Williams is based on his failure to advise Mrs. Kauchick as to what made the Caesarean operation necessary and his statement, as testified to by Mrs. Kauchick, that he did not know what caused her difficulty.
"Again the difficulty with Mrs. Kauchick's position is that there is no evidence to support the finding that Dr. Williams did know what actually caused her difficulty. He testified that he relied upon the X-ray report that her pelvic measurement would permit vaginal delivery. Mrs. Kauchick's expert medical testimony might support a finding that Dr. Williams's reliance upon the X-rays and his failure to make a clinical measurement were not in accord with the generally accepted medical practice in the community at the time. However, that would not establish that Dr. Williams was aware that he had been negligent and that, in telling Mrs. Kauchick that he did not know what caused her difficulty, he was endeavoring to conceal his negligence from her in order to avoid an action for malpractice."
Sub judice, no fraudulent means to conceal were utilized by appellees, and so the question becomes whether non-disclosure by the alleged practitioners of possible causes of the infant's decerebrate condition constitutes concealment sufficient to toll the statute, and whether there was a duty to disclose the possible or likely causes where there was no request for such information. The philosophy behind the exception to the statute of limitations of fraudulent concealment and the tolling of the statute if such concealment exists, is courts will not protect defendants who are directly responsible for the delays of filing because of their own willful acts. The purposes of the statutes of limitations are to protect defendants against unusually long delays in filing of lawsuits and to prevent unexpected enforcement of stale claims concerning which interested persons have been thrown off guard for want of reasonable prosecution.
"As a statute of repose, they afford parties needed protection against the necessity of defending claims which, because of their antiquity, would place the defendant at a grave disadvantage. In such cases how resolutely unfair it would be to award one who has willfully or carelessly slept on his legal rights an opportunity to enforce an unfresh claim against a party who is left to shield himself from liability with nothing more than tattered or faded memories, misplaced or discarded records, and missing or deceased witnesses. Indeed, in such circumstances, the quest for truth might elude even the wisest court. The statutes are predicated on the reasonable and fair presumption that valid claims which are not usually left to gather dust or remain dormant for long periods of time. *37 Riddlesbarger v. Hartford Ins. Co., 74 U.S. (7 Wall.) 386, 19 L.Ed. 257; 1 Wood, Limitations of Actions, supra § 4; Spath v. Morrow, supra. To those who are unduly tardy in enforcing their known rights, the statute of limitations operates to extinguish the remedies; in effect, their right ceases to create a legal obligation and in lieu thereof a moral obligation may arise in the aid of which courts will not lend their assistance. Cf. 34 Am.Jur., `Limitation of Actions,' § 11, p. 20." (e.s.) Wilkinson v. Harrington, R.I., 243 A.2d 745 at 752 (1968).
Generally, two elements are required before the equitable principle of fraudulent concealment will be utilized to toll the statute of limitations, to-wit: plaintiff must show both successful concealment of the cause of action and fraudulent means to achive that concealment. Cf. Prather v. Neva Paperbacks, Inc., 446 F.2d 338 (5th Cir., 1971), Crummer Company, et al. v. DuPont, 255 F.2d 425 (5th Cir., 1958), 21 Fla.Jur., Limitation of Actions, Section 62. Although it has been held that where the confidential fiduciary relationship of physician-patient exists, there is a duty to disclose material information between the parties, the majority of cases dealing with this subject relate to the duty to disclose to the patient the fact of the injury done to him. Cf. Hudson v. Moore, 239 Ala. 130 (1940), 194 So. 147; Burton v. Tribble, 189 Ark. 58 (1934), 70 S.W.2d 503; Tabor v. Clifton, 63 Ga. App. 768 (1940), 12 S.E.2d 137; Guy v. Schuldt, 236 Ind. 101 (1956), 138 N.E.2d 891; Adams v. Ison (Ky. 1952), 249 S.W.2d 791; Hinkle v. Hargens, 76 S.D. 520 (1957), 81 N.W.2d 888; and Thompson v. Barnard, 142 S.W.2d 238 (Tex.Civ.App. 1940), affd. 138 Tex. 277, 158 S.W.2d 486.
The recent decision of the United States Court of Appeals, Fifth Circuit, in Powell v. Radkins, 506 F.2d 763 (5th Cir., 1975), involved a suit by a female who was sterilized while a ward of the Florida State Department of Health and Rehabilitative Service, Division of Mental Retardation. Therein, the court noted:
"Cases cited by appellant do not support her position. Buck v. Mouradian, 100 So.2d 70 (Fla.Dist. Ct. App. 1958), stated that the statute would be tolled when the defendant prevents the plaintiff from discovering the injury inflicted by defendant. Where the plaintiff has sufficient facts to give her reason to discover the injury, as in the present case, the `prevention' rationale is no longer applicable. Thus Buck would not support tolling in this case. City of Miami v. Brooks, 70 So.2d 306 (Fla. 1954), simply stated the general rule that the statute begins to run when the plaintiff has been put on notice of his right to a cause of action. This in no way supports the tolling principle sought by plaintiff."
However, as aforestated, fraudulent concealment by defendant so as to prevent plaintiffs from discovering their cause of action, where the physician has fraudulently concealed the facts showing negligence, will toll the statute of limitations until the facts of such fraudulent concealment can be discovered through reasonable diligence. But then the question becomes what constitutes fraudulent concealment when as in the case before us, there is no active misrepresentation; in fact, there is mere silence as to possible or likely causes. Several views avail themselves to this Court in reaching a definitive conclusion. Louisell and Williams in their manual entitled "Medical Malpractice" explain several of the variant positions adopted by the different states as follows:
"Fifteen states have passed statutes specifically tolling the statute for fraudulent concealment. Ordinarily affirmative acts beyond mere silence by the physician are required. Some courts, because of the fiduciary character of the physician-patient relationship, have held that silence by the physician, where there is a *38 duty to disclose either his negligent act or the fact that an injury indeed occurred, will constitute fraudulent concealment. The most extreme position that has been taken is that actual knowledge by the physician is not necessary where he was negligent in not discovering the injury. This position essentially is equivalent to holding that in malpractice cases the statute tolls until the injury is discovered. A few cases have specifically rejected fraudulent concealment as grounds for tolling the statute in malpractice actions."
Pertaining to the fiduciary nature of the doctor-patient relationship, the United States Court of Appeals, Fifth Circuit, in Sheets v. Burman, 322 F.2d 277 (1963), quoted the following excerpt from the Indiana Supreme Court in Guy v. Schuldt, 236 Ind. 101, 138 N.E.2d 891 (1956):
"Usually, there must be some active effort on the part of the one to be guilty of concealment but where a fiduciary or confidential relationship exists, such as physician-patient, there exists a duty to disclose material information between the parties and a failure to do so results in concealment. * * * [W]here the duty to inform exists by reason of a confidential relationship, when that relationship is terminated the duty to inform is also terminated; concealment then ceases to exist. After the relationship of physician and patient is terminated the patient has full opportunity for discovery and no longer is there a reliance by the patient nor a corresponding duty of the physician to advise or inform. The statute of limitations is no longer tolled by any fraudulent concealment and begins to run."
and the Fifth Circuit Court of Appeals concluded as to the issue of whether there was fraudulent concealment so as to toll the statute of limitations, as follows:
"In Louisiana as in Indiana, therefore, the statute is tolled as to an injured patient when there is a doctor-patient relationship and the patient relies upon the doctor's skill and representation. The statute does not commence to run until there is knowledge of the act causing the damage or until the termination of doctor-patient relationship. See Aegis Insurance Co. v. Delta Fire & Casualty Co., 99 So.2d 767, 782 (La. App. 1957); R.J. Reynolds Tobacco Co. v. Hudson, 5 Cir., 1963, 314 F.2d 776."
Allen, et al, v. Layton, et al., 235 A.2d 261 (Del.Super. 1967), a Delaware suit, involved a malpractice action against a surgeon and a hospital by a patient for injuries resulting from leaving a hemostat in her body during the course of an operation. Therein the court opined:
"Fraudulent concealment is the intentional nondisclosure of material facts by one owing a duty to disclose. See 23 Am. Jur. Fraud and Deceit, § 578, p. 854. Ordinarily, the defrauding party must have knowledge of the facts concealed. If the surgeon here had known of the hemostat being left in plaintiff's body, he would have committed fraudulent concealment."
In Brown v. United States, 353 F.2d 578 (9th Cir., 1965), the United States Court of Appeals, Ninth Circuit, as to the question of whether there had been fraudulent concealment sufficient to toll the statute of limitations, recognized that no government physician stated that there had been negligent treatment of the child, but concluded:
"It is clear, however, that the parents, not later than 1956, were informed as to the exact nature of the disability and its relationship to prior medical treatment. Thus, the trial court properly concluded that to the parents there came knowledge of facts sufficient to alert a reasonable person that there may have been negligence related to the grievance for which the complaint was subsequently made. The tragedy itself, unusual and unexpected, *39 would ordinarily be expected to have alerted the parents to take steps to ascertain whether rights had accrued and if so, to protect those rights."
A surgeon who knowingly left a ball of gauze in his patient's abdominal cavity after performing an operation and failed to apprise the patient of the fact was held guilty of continuing negligence and fraudulent concealment tolling the statute of limitations until he performed his duty of removing the foreign substance or the patient learned or through the exercise of reasonable diligence should have learned of its presence. In that case the patient continued under the care and treatment of this physician for several years, but never disclosed to her the presence of this foreign substance in her abdomen. The Arkansas Supreme Court, in Burton v. Tribble, supra, held:
"... if, in the exercise of ordinary care and skill, appellee knew that the foreign substance was left in appellant's abdominal cavity, it then and thereupon became his imperative duty to apprise appellant of this fact and not conceal it from her until the statute of limitation had attached."
This Court in Proctor v. Schomberg, 63 So.2d 68 (Fla. 1953), found that if the dentist who was charged with malpractice in leaving a piece of broken metal instrument or other foreign substance in the area of the bone structure where plaintiff's impacted wisdom tooth had been removed by the dentist and where x-rays of the affected bone area were taken ten months after removal of the tooth, fraudulently concealed such fact from his patient, the statute of limitations would not commence to run against the patient's cause of action until the patient discovered or had a reasonable opportunity to discover the injury. Cf. Buck v. Mouradian, supra, wherein a Florida Appellate Court explained that where an injured person is prevented from knowing of his injury due to concealment of the fact of his injury by his physician, the statute of limitations will be tolled when it can be shown that fraud has been perpetrated on the injured party sufficient to place him in ignorance of his right to a cause of action or to prevent him from discovering his injury. Sub judice, as aforestated there was not and could not be any concealment of the patently obvious injury.
After careful analysis of the variant views of other jurisdictions in this country and previous views espoused by this Court and other Florida Appellate Courts, we hold that, although generally the fraud must be of such a nature as to constitute active concealment to prevent inquiry or elude investigation or to mislead a person who could claim a cause of action, we do recognize the fiduciary, confidential relationship of physician-patient imposing on the physician a duty to disclose; but, this is a duty to disclose known facts and not conjecture and speculation as to possibilities. The necessary predicate of this duty is knowledge of the fact of the wrong done to the patient. Cf. Kauchick, supra. Where an adverse condition is known to the doctor or readily available to him through efficient diagnosis, he has a duty to disclose and his failure to do so amounts to a fraudulent withholding of the facts, sufficient to toll the running of the statute. But, where the symptoms or the condition are such that the doctor in the exercise of reasonable diligence cannot reach a judgment as to the exact cause of the injury or condition and merely can conjecture over the possible or likely causes, he is under no commanding duty to disclose a conjecture of which he is not sure. Therefore, his silence as to a possible condition or cause which he is unable to verify in the exercise of reasonable diligence does not standing alone constitute sufficient fraudulent withholding to toll the statute of limitations.
Accordingly, we would answer the third and fourth questions in the negative as to all parties to the suit.
*40 Evident from the record, the United State District Court's decision, the certificate of facts, and as conceded by the parties, the injury was patent and therefore there could be no concealment and resulting duty to disclose the fact of the injury on the part of the physicians. The record is not clear on the cause of the injury and on this issue we render no opinion as to whether this was an adverse condition known to the doctor for which he had a duty to disclose, failure of which would toll the statute.
For the aforegoing reasons, the first question is answered in the affirmative. The nature of the infant's condition was patent in 1965, before his discharge from the hospital, and was reaffirmed by Dr. Vicale in October, 1965; the records at all times were readily available. Cf. City of Miami v. Brooks, supra, Cristiani v. City of Sarasota, supra, and Buck v. Mouradian, supra. The second question is answered in the affirmative. Again, we note that there was no attempt to conceal records from the plaintiffs, but rather, as conceded by the parties, the records were of such a character as to be obtainable by or available to the plaintiffs. Mere ignorance of the easily discoverable facts which constitute the cause of action will not postpone the operation of the statute of limitations as to the party plaintiffs. As above explained and pursuant to the peculiar facts of this case above described, the third question is answered in the negative. Although the confidential and fiduciary nature of the doctor-patient relationship does impose a duty on the physician to disclose known causes (or causes that should be known through exercise of reasonable care and due diligence) readily available to him through efficient diagnosis and failure to do so constitutes sufficient concealment to toll the statute, there is no concomitant duty imposed on the physician to relate all merely possible or likely causes of the injury. Pursuant to the specific facts (as contained in the certificate) of the instant cause, the fourth question is answered in the negative for the same reason as question three above-explained.
Having expressed our opinion on the questions of law presented, we must leave to the Federal System the establishing of, and application to, the facts in this cause.
OVERTON, C.J., ADKINS, ENGLAND, SUNDBERG and HATCHETT, JJ., and BOYER, District Court Judge, concur.
NOTES
[1] We note, although not material to the instant cause, that relative to the statute of limitations in malpractice suits, Subsection (6) of Section 95.11, Florida Statutes, was amended in 1971 by Chapter 71-254, to take effect July 1, 1972, as follows:

"(6) Within two years.  An action by another than the state upon a statute for a penalty or forfeiture; an action for libel, slander, assault, battery, or false imprisonment; an action arising upon account of an act causing a wrongful death; and an action to recover damages for injuries to the person arising from any medical, dental, optometric, chiropodial, or chiropractic treatment or surgical operation, the cause of action in such cases not to be deemed to have accrued until the plaintiff discovers, or through use of reasonable care should have discovered, the injury." (e.s.)
and this section was subsequently amended in 1974 to provide:
"(4) Within two years. 
(a) An action for professional malpractice, whether founded on contract or tort; provided that the period of limitations shall run from the time the cause of action is discovered or should have been discovered with the exercise of due diligence; provided, however, that the limitation of actions herein for professional malpractice shall be limited to persons in privity with the professional."
which act became effective January 1, 1975, but further provided that any action that will be barred when this act becomes effective and that would not be barred under prior law may be commenced before January 1, 1976. Cf. DeLuca v. Mathews, 297 So.2d 854 (Fla.App. 4, 1974).
[2] The Third District Court of Appeal in Buck, supra, explained: "The general rule is to the effect that when there has been notice of the invasion of a legal right or a person has been put on notice of his right to a cause of action, the statute of limitations begins to run. However, in a tort action based upon malpractice, the application of the general rule becomes difficult where the injured person is prevented from knowing of his injury due to the concealment of the fact of his injury by the treating physician. In such cases, there is a well-recognized exception which tolls the running of the statute when it can be shown that fraud has been perpetrated upon the injured party sufficient to place him in ignorance of his right to a cause of action, or to prevent him from discovering such injury. We therefore come to the point of considering the sufficiency of the pleadings, interrogatories and admissions of the parties to support the appellant's claim of fraudulent concealment of her injury, and the negligent act of the appellee."