509 So.2d 356 (1987)
William A. HUMBER and Dorothy Humber, His Wife, Appellants,
v.
Thomas ROSS, M.D., and P.A., Doctors Hospital of Lake Worth, Inc., and Florida Patient's Compensation Fund, Appellees.
No. 4-86-0479.
District Court of Appeal of Florida, Fourth District.
June 10, 1987.
Rehearing Denied July 28, 1987.
Edna L. Caruso of Edna L. Caruso, P.A., West Palm Beach, and Thompson & O'Brien, Fort Lauderdale, for appellants.
Nancy P. Maxwell of Metzger & Sonneborn, West Palm Beach, for appellees-Thomas Ross, M.D., and Thomas Ross, M.D., P.A.
Roy Watson of Adams, Coogler, Watson & Merkel, P.A., West Palm Beach, for appellee-Doctors Hospital.
Marjorie Gadarian Graham of Jones & Foster, P.A., West Palm Beach, for appellee-Florida Patient's Compensation Fund.
*357 GLICKSTEIN, Judge.
Plaintiffs in a medical malpractice suit appeal final judgment in favor of the defendants. We affirm.
William A. Humber is the patient who brought the medical malpractice action against Dr. Thomas Ross and his professional association, Doctors Hospital of Lake Worth, Inc., and later, by amended complaint, Florida Patient's Compensation Fund. His wife was a plaintiff derivatively. They alleged injury because of medical negligence that occurred between December 7, 1979, and December 27, 1979, when Mr. Humber was a patient at Doctors Hospital and under Dr. Ross' care. The initial complaint was filed December 28, 1981. The amended complaint was filed January 31, 1983. The defendants raised a statute of limitations defense. Trial was set for October 21, 1985, and actually proceeded for a few days, but a mistrial was declared because the amount of time needed had been underestimated and the court was unable to allot additional time at that point. The parties agreed, however, that the trial court could hear the issue of the affirmative defense of statute of limitations on a non-jury basis.
A hearing on that issue was held on November 1, 1985. The basic question was when did the plaintiffs discover that they had a cause of action, or when should they have reasonably made this discovery. By final judgment rendered February 13, 1986, the trial court entered final judgment in favor of the defendants, having found that Mrs. Humber knew or should have known of the cause of action the day Mr. Humber fell and broke his hip, December 10, 1979, and Mr. Humber knew or should have known at least by December 27, 1979, when he left the hospital. The limitation period was thus concluded no later than December 27, 1981, the day before the initial complaint was filed against Dr. Ross and the hospital. We agree.
On December 7, 1979, on Dr. Ross' orders, Mr. Humber, then aged 61, entered Doctors Hospital for treatment of a herpes zoster infection on his forehead which could have endangered his vision. Dr. Ross is a dermatologist. Humber had trouble sleeping in the hospital, and Dr. Ross prescribed a stronger sleeping medication than Humber was already taking, on December 9, 1979, at Humber's request. According to Mrs. Humber, Mr. Humber was so heavily sedated that day that all he did was drift in and out of sleep.
According to the nurses, they found Mr. Humber sprawled on the floor at 2:30 a.m. December 10, 1979. He was lethargic and disoriented. The nurses put him back in his bed. Although Dr. Ross said he relied on the nursing staff to tell him of any unusual occurrences, Dr. Ross was not immediately notified of this incident. Because Humber complained of hip pain, the nurses contacted Dr. Ross at about 6:00 a.m. and he arrived at the hospital at about 7:00 a.m. Dr. Ross ordered x-ray of the hip. The x-ray disclosed a fractured hip. Dr. Ross notified Mrs. Humber. Mr. Humber had no recollection of the fall and did not know how the fracture occurred.
Either on December 10 or the next day there was a conversation between Dr. Ross and Mrs. Humber, during which Dr. Ross told her which physicians he had called in to treat Mr. Humber, and answered her questions about the medications he had prescribed for the patient. Mr. Humber suffered a myocardial infarction sometime later. The record does not seem to show exactly when: Humber's patient chart indicates it was diagnosed on December 13. This was taken to explain the pulmonary edema which had been observed earlier. Because of the skin infection and the heart attack, treatment for the hip fracture was postponed. There were also neurological symptoms which for a while were thought to have possibly been caused by a stroke or two.
According to Mrs. Humber, Dr. Ross told her on December 10 that her husband had broken restraints he was under, tried to climb over the bedrail, and fallen, hurting himself. She had no knowledge of any restriants, and had seen her husband get in and out of the bed by going around the bedrails, which extended only halfway down the side of the bed. She was confused *358 by Dr. Ross' explanation of the injury. At the time, however, Mrs. Humber said, she had no reason to believe that Dr. Ross or the hospital had any responsibility for her husband's fall.
The Humbers were new in the area and did not know the reputation of hospitals in the area. Mrs. Humber was concerned that her husband's fracture had not been set at once, as she thought fractures always were. She consulted Basil Diamond, a distant relative by marriage. He is also an attorney, but both she and Diamond testified that at the time the consultation was of the family friend nature, not the attorney-client kind. It seemed to Diamond that Mrs. Humber did not understand the nature of her husband's illnesses or what were the possible treatments. He suggested she talk to someone in the hospital administration and ask what caused the hip fracture. He also advised her to get copies of the hospital records to find answers to some of her questions. Mrs. Humber went to see Mr. Ice, the assistant administrator. About a month later she received a letter from Mr. Ice telling her only that Mr. Humber had been found lying on the floor at 2:30 a.m., the night of the fall. Mrs. Humber denied she had any thoughts about suing the hospital or Dr. Ross or was trying to get information in support of such a suit.
Both Mrs. Humber and Diamond testified Mrs. Humber mainly sought from Diamond information about some other orthopedist who might be consulted about treatment of the hip fracture. She felt put off by the fact that one day she would be told the fracture would be pinned, and the next day it was all off.
Diamond suggested she talk with Dr. Brandon, which she did. She was impressed with him, and because he did not practice at Doctors Hospital she had her husband transferred to John F. Kennedy Hospital. She also had complaints about her husband's food, bathing and the low temperature in his room. Ultimately, Mr. Humber was transferred to a Veterans Administration hospital in Massachusetts.
Subsequently, Humber developed infections in both of his lower legs and they were amputated: the left leg in May 1980, and the right leg in October 1980. Because of this Mrs. Humber scheduled an appointment with Diamond when she was planning to visit Florida again, early in 1981, and kept the appointment. According to Diamond, that was when she first broached the possibility of an action for medical malpractice. She asked Diamond to recommend a lawyer for the purpose, and he recommended her present attorney. Diamond said he did it as a family friend and sought no fee for the referral.
On her attorney's instruction, Mrs. Humber requested and received a copy of the Doctors Hospital records on February 12, 1981. She received a copy of the nurses' notes on April 9, 1981, on a second request, as they had not been included in the record copy given her on her first request. The nurses' notes spoke of Mr. Humber's fall only in the past tense. Nothing was said about his having been found on the floor at 2:30 a.m.
The parties stipulated that the plaintiffs' experts would testify that based on the Doctors Hospital records it was their opinion that Dr. Ross and the hospital had been negligent in causing the hip fracture, which in turn resulted in the lower leg amputations later on. The issue before the court, however, was whether the statutory limitation period had run at the time the action was initiated.
The essence of the defendants' argument was that Mrs. Humber must have had notice of the medical malpractice during her husband's stay at Doctors Hospital because after the fall she asked Dr. Ross about the medication her husband had been given, and was told of the sedative; and that her transfer of the patient to another hospital indicated she had such notice.
Dr. Ross admitted Mrs. Humber had not indicated to him that she thought there was any relationship between her husband's medication and his accident, and that he understood her dissatisfaction leading to the patient transfer had to do with the air conditioning problem, the food, and other *359 hospital conditions. Mrs. Humber testified she inquired about the medication only because her husband seemed so sleepy, and that Dr. Ross told her he had given Mr. Humber a mild sedative. Ross said Mrs. Humber never questioned him about the fall or why or how it occurred and she never said to Dr. Ross that she was transferring her husband to John F. Kennedy Hospital because of the fall.
In essence the court concluded as a matter of law that because Mrs. Humber was aware of Mr. Humber's injury due to a fall, on December 10, 1979, and Mr. Humber must have known or should have known of it no later than the day he was transferred out of Doctors Hospital, December 27, 1979, the claim was filed too late against both Dr. Ross and Doctors Hospital, having been filed on December 28, 1981. The court said that as there is no controversion of evidence that the hospital records would have been made available to plaintiffs if requested, the plaintiffs were charged with constructive knowledge of their contents. In support of this the court cited the case of Nardone v. Reynolds, 333 So.2d 25 (Fla. 1976).
Nardone is instructive respecting more than the principle that absent fraudulent concealment of the records, constructive knowledge of the contents of the medical records will be imputed to the plaintiffs, and the statutory limitation period will run, in spite of the plaintiff's ignorance of those contents, so long as the records could have been obtained. See id. at 34. Nardone states also that the limitation period commences when the plaintiffs have knowledge of the physical condition and drastic change therein but do not know of the causal connection of the defendants' acts or failure to act. Although Nardone concerns specifically a suit of a parent and a minor child because of injury to the minor child, the principles expressed are not dependent on those facts, but may be applied more generally to medical malpractice cases, as the applicable statute of limitation has not changed substantially.
In essence, appellants argue that the burden of proving the affirmative defense was on appellees, with which we agree; that the limitation period did not start to run when appellants knew or should have known of the fall and the fractured hip, when the amputations did not occur until May and September 1980, and the causal connection was not known until receipt of the hospital records in February and April 1981, with which we disagree.
We reject appellant's position, because logically it could mean that if there was negligence on the part of the doctor or hospital, there could be an action brought for the broken hip; and, upon discovery of the later infection, and the resulting amputation, yet another action, regardless of the expiration of the limitation period applicable to the earlier action, and even though there was no fraud or concealment on the part of the defendants.
GUNTHER, J., concurs.
LETTS, J., concurs in conclusion only.