BASKIN, Judge.
This appeal follows the entry of summary final judgments in favor of Dr. Kjell Koch, the University of Miami, and Lederle Laboratories following a determination that the statute of limitations precludes appellants from pursuing their claims. We reverse.
In April 1970, Adam Bogorff, three and a half years old, was diagnosed as having leukemia. In June 1970, the Bogorff family moved to Florida. On the recommendation of his treating physicians, Adam became the patient of Dr. Kjell Koch, a member of the medical staff at the University of Miami. At that time, Adam’s leukemia was in remission. Dr. Koch treated Adam with doses of orally administered methotre-xate, oncovin, and prednisone. Methotre-xate is a drug manufactured by Lederle Laboratories. In June 1971, Dr. Koch supplemented Adam’s treatment with three doses of methotrexate administered intra-thecally[1] (in the spine), in conjunction with cranial and spinal radiation. According to the Bogorffs, Lederle indicated (in the 1971 Physician’s Desk Reference) that intrathecal administration of methotrexate was appropriate, although the Federal Drug Administration had not approved such use. After he received the first three injections, Adam experienced as side effects only a slight headache and loss of appetite.
In January 1972, Dr. Koch administered another intrathecal injection of methotre-xate as a prophylactic measure. Approximately one month later, in February 1972, the Bogorffs noticed that Adam was lethargic and was losing coordination and mental function. He also suffered from headaches, nausea, and vomiting. In April 1972, Adam began experiencing convulsions and became comatose. Although he recovered from the coma in July 1972, Adam was unable to walk or talk. When the Bogorffs consulted Dr. Koch about these alterations in Adam’s condition, Dr. Koch informed them that the changes were the result of either the spread of the leukemia to the brain or a viral infection. In an effort to stop the convulsions, the Bo-gorffs took Adam to a neurosurgeon, who advised them that Adam’s condition was caused by the spread of leukemia to the brain.
In the summer of 1972, Mr. Bogorff came across an article in a medical journal[2] linking intrathecal methotrexate treatment of leukemia to encephalopathy (brain damage). Mr. Bogorff showed the article to Dr. Koch, who read it in his presence, threw it in the trash can, and informed Mr. Bogorff that methotrexate treatment had no relationship to Adam’s condition.[3] Adam remained Dr. Koch’s patient for several more years without experiencing significant improvement in his medical condition.
*1225 When the Bogorffs moved to Florida, Dr. Paul Winick became Adam’s pediatrician. In January 1973, Dr. Winick wrote to Dr. Koch, stating that it was difficult to ascertain whether Adam’s condition resulted from the methotrexate injections. From 1973 to 1979, the Bogorffs, hoping to improve Adam’s condition, took him to a number of other physicians. A radiologist in charge of Adam’s radiation therapy sent a letter to Dr. Winick in May 1973, confirming Dr. Winick’s belief that some remote connection might exist between the state of Adam’s health and the intrathecal metho-trexate treatment. In May 1975, Adam was examined by a neurologist who sent copies of his evaluative report to both Dr. Koch and Dr. Winick. In the report, the neurologist agreed that Adam seemed to have some kind of encephalopathy related either to his leukemia, radiation, or metho-trexate treatment.
In July 1977, Mrs. Bogorff took Adam to St. Jude’s Hospital in Memphis, Tennessee, for a nutritional evaluation because he was not growing at a rate normal for his age. After examining Adam, Dr. Paul Zee, the physician in charge of nutrition at St. Jude’s, wrote to Mrs. Bogorff commending her on her excellent care of Adam and informing her that the details of his examination had been sent to Dr. Winick. Dr. Zee’s letter to Mrs. Bogorff gave no indication that he had found any cause for Adam’s condition other than that postulated by Dr. Koch; however, in a report sent to Dr. Winick at the same time, Dr. Zee stated that his diagnosis of Adam’s condition was “encephalopathy with reversible anatomical changes possibly secondary to radiation and intrathecal methotrexate.” Dr. Winick concurred with this diagnosis. By 1979, Adam was described as “a total quadriplegic, functioning at an infantile level, with diffuse brain damage, no speech, and little chance of improvement.”
With the exception of Dr. Zee’s letter to Mrs. Bogorff, the physicians’ letters or reports were not shown to or discussed with the Bogorffs. The Bogorffs could not recall any of Adams’ treating physicians ever informing them of a possible connection between methotrexate treatment and Adam’s condition. Although these reports were placed in Adam’s medical files kept by Dr. Koch and Dr. Winick, the Bogorffs maintain they knew nothing of the letters and reports until February 1982; they allege that when they asked Jackson Memorial Hospital for Adam’s hospital records,[4] which would have included Dr. Koch’s medical file, they were told there were no records.
In October 1979, the Bogorffs began to consider the possibility that Adam’s medical care may have been negligent. They contacted a law firm to investigate, but were advised that no cause of action existed.
The Bogorffs made no further inquiries until February 1982. At that time, they engaged an attorney to assist them in applying to the Social Security Administration for financial aid for Adam’s care. The Bogorffs requested Adam’s medical records from Dr. Winick, and upon examining them, discovered Dr. Zee’s letter. In December 1982, the Bogorffs filed a multi-count complaint against Dr. Koch and the University of Miami, seeking damages for their medical malpractice, and against Led-erle Laboratories for damages for products liability arising from the manufacture and dissemination of methotrexate. In response to defense motions raising the bar of statutes of limitations, the trial court entered, vacated, and in 1986, reentered summary judgments in favor of all three defendants.
The Bogorffs contend that their claims were not barred by the statute of limitations. Resolution of the limitations issue depends on when the Bogorffs knew, or through the exercise of reasonable diligence, should have known of the alleged negligence or of the ensuing injury. Nardone v. Reynolds, 333 So.2d 25 (Fla.1976); *1226 Nolen v. Sarasohn, 379 So.2d 161 (Fla. 3d DCA 1980). Substantive questions pertaining to the merits of the asserted claims must await determination of the limitations question.
Section 95.11(4), Florida Statutes (1971) (amended 1974, 1975), governs the limitations question before us. That section prescribes a four-year limitations period with no statute of repose for any actions not specifically provided for in Chapter 95.[5] See Dade County v. Ferro, 384 So.2d 1283 (Fla.1980); Foley v. Morris, 339 So.2d 215 (Fla.1976); Hellinger v. Fike, 503 So.2d 905 (Fla. 5th DCA 1986), review denied, 508 So.2d 14 (Fla.1987). In malpractice lawsuits governed by this section, timeliness of filing is measured from the date a plaintiff has notice of the negligent act giving rise to the cause of action, or notice of the physical injury resulting from the negligent act. Nardone; City of Miami v. Brooks, 70 So.2d 306 (Fla.1954).
A plaintiff who lacks actual knowledge is deemed to have constructive notice of a negligent act disclosed by the contents of obtainable hospital and medical records. Nardone, 333 So.2d at 34. But see Tetstone v. Adams, 373 So.2d 362 (Fla. 1st DCA 1979) (knowledge of medical records not imputed to patient when hospital and medical records contain technical terms that an ordinary lay person could not be expected to understand), cert. denied, 383 So.2d 1189 (Fla.1980). However, when defendants fraudulently conceal or misrepresent their negligence, the statute of limitations does not begin to run until plaintiff is able to discover the negligence. Nardone; Almengor v. Dade County, 359 So.2d 892 (Fla. 3d DCA 1978); Buck v. Mouradian, 100 So.2d 70 (Fla. 3d DCA), cert. denied, 104 So.2d 592 (Fla.1958).
Questions of fact pertaining to the statute of limitations exist in the record before us: When did the Bogorffs know that Dr. Koch’s conduct was possibly negligent? Did Dr. Koch or the University of Miami conceal information the Bogorffs needed to recognize the existence of a claim? The record discloses that the variation in Adam’s condition was not ascertainable immediately upon administration of the intrathecal methotrexate; the deviation did not become apparent until approximately three months after the treatments ended. Thus, no immediate change of condition put the Bogorffs on notice of the connection between the condition and the treatment. See Humber v. Ross, 509 So.2d 356 (Fla. 4th DCA), review denied, 518 So.2d 1275 (Fla.1987). In fact, when the Bogorffs asked Dr. Koch specifically about the cause of Adam’s condition, he told them that Adam was suffering either from some viral infection or from the spread of the leukemia to the brain. When the Bogorffs handed Dr. Koch the 1972 medical journal article attributing encephalopathy to me-thotrexate treatment, Dr. Koch denied any relationship between the methotrexate and Adam’s condition.[6] Furthermore, when Dr. Koch learned of the connection between the methotrexate and Adam’s condition, he allegedly failed to inform the Bogorffs.[7] Al *1227 though a physician is not required to disclose mere conjecture or speculation about a patient’s condition, as one who occupies a position of trust with a patient, a doctor has an affirmative duty to disclose facts which the doctor knows or, through efficient diagnosis, should know. The failure to do so constitutes fraudulent concealment sufficient to toll the statute of limitations. Nardone, 333 So.2d at 39.
The Bogorffs’ patient-physician relationship with Dr. Koch permitted them to place great faith in his skills and to rely on his affirmative representations that the me-thotrexate was not connected to Adam’s condition.[8] If Dr. Koch fraudulently concealed the very facts which would have put the Bogorffs on notice of their cause of action, the statute of limitations does not bar their claims. Thus, it is essential that a jury determine Such questions as: the extent of Dr. Koch’s knowledge of the cause of Adam’s condition; when he gained that knowledge; and whether he should have informed the Bogorffs.[9]
The Bogorffs’ lack of sophisticated medical knowledge during a grave medical crisis does not foreclose their right to seek recovery. If, in April 1972, they knew that something was wrong with Adam, it does not necessarily follow that they knew or should have known that Adam’s condition was caused by medical negligence. See Florida Patient’s Compensation Fund v. Sitomer, 524 So.2d 671, 674 (Fla. 4th DCA 1988) (“knowledge of an injury, without more, does not necessarily put a patient on notice that the injury was caused by the negligence of another”); Schafer v. Lehrer, 476 So.2d 781 (Fla. 4th DCA 1985). Whether the Bogorffs should have been able to distinguish between the severe physical effects of leukemia and those produced by drug-induced encephalopathy is a question for jury determination. See Moore v. Morris, 475 So.2d 666 (Fla.1985) (parents of infant knew that emergency situation existed at birth of infant, but such knowledge, without more, is insufficient to impute notice of negligence to them); Almengor (infant’s condition could have been attributable to congenital defect rather than to medical negligence).
A trial court is not permitted to resolve issues of fact when deciding a motion for summary judgment; its role is to decide whether issues exist for resolution by the trier of fact. Moore. That principle extends to the appellate court which may not anticipate the outcome of matters properly decided by full, rather than summary, consideration. “Summary judgments should be cautiously granted in negligence and malpractice suits.” Moore, 475 So.2d at 668. Only in the complete absence of any genuine issue of material fact should summary judgment be granted, Moore; Holl v. Talcott, 191 So.2d 40 (Fla.1966); see also Howard v. Department of Health & Rehabilitation Servs., 541 So.2d 117 (Fla. 3d DCA 1989); otherwise, the trial court should submit the cause to the jury. The court’s immediate concern extends only to the statute of limitations and the asserted existence of fraudulent concealment tolling the statute. Moore; Sitomer; Schafer; Phelan v. Hanft, 471 So.2d 648 (Fla. 3d DCA 1985), disapproved on other grounds, Carr v. Broward County, 541 So.2d 92 (Fla.1989).
*1228 We turn next to the summary judgment entered in favor of Lederle Laboratories, the manufacturer of methotrexate. During the period Adam was receiving in-trathecal methotrexate injections, products liability actions were governed by a four year statute of limitations. § 95.11(4), Fla. Stat. (1971). In 1975, section 95.031(2), Florida Statutes (1975), established a statute of repose for products liability actions. According to section 95.031(2), the period of limitation in a products liability action commences to run “from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence, ... but in any event within 12 years after the date of delivery of the completed product to its original purchaser, regardless of the date the defect in the product ... was or should have been discovered.” [10] The twelve-year bar has been applied to cases in which the incident giving rise to the cause of action occurred before 1975, the year the repose statute became effective, provided the operation of section 95.031(2) does not bar a cause of action before it accrues, thereby denying an injured party access to the courts. See Diamond v. E.R. Squibb & Sons, Inc., 397 So.2d 671 (Fla.1981); Purk v. Federal Press Co., 387 So.2d 354 (Fla.1980); Bauld v. J.A. Jones Constr. Co., 357 So.2d 401 (Fla.1978).
The statute of limitations in a products liability action begins to run only when both the “moment of trauma” and the “moment of realization” have occurred. Steiner v. Ciba-Geigy Corp., 364 So.2d 47, 53 (Fla. 3d DCA 1978), cert. denied, 373 So.2d 461 (Fla.1979). Trauma is defined as “ill effect, damage or injury;” realization includes the “ ‘known or should have known’ element associated with trauma.” Steiner, 364 So.2d at 53. Although at times the moment of trauma and the moment of realization may coincide, there are instances in which the trauma is not of a type which would give rise to the realization that it was caused by negligence. Steiner, 364 So.2d at 53. Genuine issues of fact exist as to when the Bogorffs’ moment of realization occurred. The injury Adam sustained, which the Bogorffs now link to the intra-thecal injection of methotrexate, was not easily distinguishable from the leukemia he suffered.
In examining the record, we find no information indicating precisely when the University of Miami and Dr. Koch received delivery of the methotrexate used to treat Adam. Thus, we cannot determine whether the Bogorffs’ cause of action should be barred under the twelve-year limitation provided in section 95.031(2), Florida Statutes (1975). For these reasons, we reverse the final summary judgment in favor of Lederle.
Reversed and remanded for further proceedings consistent with this opinion.
FERGUSON, J., concurs.

. Intrathecal injections of methotrexate, unlike oral doses of methotrexate, cross the blood-brain barrier to act on toxic cells in the nervous system.

.Mr. Bogorff was employed as a university librarian; in that capacity, he had access to numerous medical journals. As a service to Dr. Koch, Mr. Bogorff would randomly gather articles dealing with leukemia and provide them to Dr. Koch. The article discussing intrathecal methotrexate treatment and encephalopathy was one of many articles he gave Dr. Koch during their relationship. Mr. Bogorff later stated that he did not read the article at that time.

.Dr. Koch disputes the statement that he threw the article in the trash can. Because we are reviewing a final summary judgment, we must view the facts in the light most favorable to the losing party. Moore v. Morris, 475 So.2d 666 (Fla.1985).

. Jackson Memorial Hospital is operated by the Public Health Trust of Dade County. The University of Miami, in its contracts with the trust, staffs and supervises the medical staff at Jackson Memorial Hospital. Because Dr. Koch treated Adam at Jackson Memorial Hospital facilities, Adam’s medical files would be maintained at the hospital.

. The statute of limitations contained in section 95.11(4)(b), Florida Statutes (1987), provides a two-year limitations period with a four-year statute of repose. If fraud, concealment, or intentional misrepresentation prevent discovery of the injury within the four-year period, the limitations period is extended two years, hut may not exceed seven years from the date the incident giving rise to the injury occurred.

. The dissent utilizes Robert Bogorffs discovery of the medical journal article to demonstrate that the Bogorffs had knowledge of the cause of Adam’s condition in 1972. However, as a matter of law, a plaintiff with no medical knowledge beyond that of an ordinary lay person may not be charged with knowledge of technical medical information such as that contained in a medical journal article. Nolen v. Sarasohn, 379 So.2d 161 (Fla. 3d DCA 1980); Tetstone v. Adams, 373 So.2d 362 (Fla. 1st DCA 1979), cert. denied, 383 So.2d 1189 (Fla.1980).

.The dissent finds that the evidence suggests only a tenuous connection between the metho-trexate and Adam's condition, and relies upon Nardone in holding that Dr. Koch did not, therefore, have a duty to disclose that information to the Bogorffs. On the contrary, the evidence strongly indicates that Adam’s treating physicians found a connection between the methotre-xate and Adam’s condition from the beginning. Whether Dr. Koch knew with certainty of the relationship between the methotrexate and Adam’s condition so as to give rise to a duty to *1227 disclose is a question of fact for jury determination.

. The dissenting opinion states that the Bogorffs did not blindly accept Dr. Koch’s diagnosis of Adam’s condition, but consulted at least two other doctors. The record shows that the Bo-gorffs consulted other doctors, not because they did not believe Dr. Koch, but because Dr. Koch had stated that he could do nothing more for Adam. The Bogorffs continued to take Adam to Dr. Koch until the doctor left the area in Í978, thereby demonstrating their faith in his judgment.

. The University of Miami, as employer of Dr. Koch, may be vicariously responsible for his actions. Jaar v. University of Miami, 474 So.2d 239 (Fla. 3d DCA 1985), review denied, 484 So.2d 10 (Fla.1986). The record discloses that the University of Miami may have been culpable in its own right for the Bogorffs’ inability to discern the truth about Adam’s condition: when the Bogorffs requested Adam’s medical records from Jackson Memorial Hosptial, they were told there were none.

. The twelve year repose provision for products liability actions was repealed effective July 1, 1986. See Ch. 86-272, Laws of Fla. The repeal, however, has no retroactive application. Melendez v. Dreis & Krump Mfg. Co., 515 So.2d 735 (Fla.1987).