933 So.2d 659 (2006)
Arturo VIDAL and Hoida Vidal, his wife, Appellant,
v.
Delores MACKSOUD, M.D. and Delores Macksoud, M.D., P.A., et al., Appellee.
No. 3D05-1522.
District Court of Appeal of Florida, Third District.
July 12, 2006.
*660 Hommer Bonner and Douglas F. Eaton, Miami, for appellant.
Wicker, Smith, O'Hara, McCoy, Graham & Ford, P.A. and Shelley H. Leinicke, Ft. Lauderdale, for appellee.
Before GREEN, FLETCHER, and RAMIREZ, JJ.
GREEN, J.
Arturo Vidal, and his wife, Hoida, sued Delores Macksoud, M.D., and Delores Macksoud, M.D., P.A. (collectively "Dr. Macksoud") for medical malpractice. A jury returned a verdict in their favor for $124,800 but assessed fifty percent (50%) comparative negligence to Arturo Vidal. The trial court entered a final judgment in accordance with the jury's findings, which prompted this appeal. The Vidals solely assert that the comparative negligence cannot stand and that their motion and renewed motion for directed verdict should have been granted where the defense failed to sustain its burden of proof on this issue. Based upon our careful review of the record evidence, we agree and reverse.
In October 1996, Arturo Vidal went to his primary treating physician, Dr. Sobrevilla, and complained of the recent onset of weakness in his right leg. Dr. Sobrevilla referred him to Dr. Macksoud, a neurologist, for a neurological examination. Dr. Macksoud ordered an MRI of the lumbar spine, and EMG studies for Vidal's arms. Dr. Macksoud's diagnosis was that of stroke, lumbar disc disease and carpal tunnel syndrome. Based upon this diagnosis, Dr. Macksoud referred Arturo to physical therapy for treatment. Arturo initially attended therapy regularly, but discontinued it when he did not notice any improvement. Mrs. Vidal encouraged Arturo to resume physical therapy, which he did. He, however, experienced little improvement.
In August 1997, Arturo returned to Dr. Macksoud and complained that his symptoms had worsened. During this visit, Dr. Macksoud observed and noted some objective neurological findings that led her to order a second round of imaging studies, including MRIs of the brain, cervical *661 spine and lumbar spine. These studies revealed severe cord compression in the cervical spine and no lesions on the brain. Based upon these findings, Dr. Macksoud immediately referred Arturo to a neurosurgeon who performed emergency surgery on Arturo in October 1997, for spinal cord compression, an ongoing disease process. After this surgery, Arturo had some immediate improvement, but was left with some permanent damage as a result of the delay in the surgery.
Arturo filed the instant malpractice action against Dr. Macksoud. His claim was that Dr. Macksoud had negligently failed to properly and timely diagnose his cervical myelopathy or spinal cord compression prior to September 1997. He further claimed that as a result of her misdiagnosis, his delayed treatment caused him to sustain permanent damages.
Dr. Macksoud countered that her initial diagnosis of stroke, lumbar disc disease and carpal tunnel syndrome was correct and that there was no objective evidence that Arturo was suffering from cervical myelopathy prior to September 1997. Essentially, she maintained that she appropriately treated Arturo for the recovery of a stroke from September 1996 until April 1997 by performing thorough and comprehensive neurological examinations at all visits, properly prescribing appropriate medications and ordering all appropriate tests. She contended that Arturo did not manifest any objective neurological symptoms of spinal cord compression until approximately one year after his initial visit with her. She also raised the issue of comparative negligence in her pleadings.
The case proceeded to jury trial. The crux of the liability issue was essentially whether Arturo was suffering from cervical myelopathy which went undiagnosed by Dr. Macksoud prior to September 1997, or whether Arturo's injuries prior to that time were properly attributable to a stroke as diagnosed by Dr. Macksoud. Not surprisingly all of the plaintiffs' experts opined that Dr. Macksoud misdiagnosed Arturo's complaints in September 1997 and all of the defense experts opined that Dr. Macksoud's initial diagnosis of stroke was correct.
At the close of the defendant's case, the plaintiffs moved for a directed verdict on the issue of comparative negligence on the grounds that Dr. Macksoud had not come forth with any proof of this defense. The trial court reserved ruling on this motion and allowed the issue to go to the jury. The jury returned its verdict in the plaintiffs' favor, which means that the jury found that Vidal's injuries were the result of undiagnosed cervical myelopathy rather than a stroke. The jury, however, attributed fifty percent (50%) comparative negligence to Arturo Vidal. Thereafter, the plaintiffs filed a renewed motion for directed verdict on the affirmative defense of comparative negligence. The trial court denied this motion and entered judgment accordingly.
The plaintiffs' sole argument on appeal is that the issue of comparative negligence should never have been placed before the jury where the defense did not meet its burden of proof on this issue. We agree.
In order to prove the affirmative defense of comparative negligence in a medical malpractice action, a defendant must prove by competent evidence that: 1) the plaintiff-patient owed a duty of care to himself; 2) the patient breached that duty; and 3) the breach was the proximate cause of the damages the patient sustained. See Borenstein v. Raskin, 401 So.2d 884 (Fla. 3d DCA 1981); Riegel v. Beilan, 788 So.2d 990 (Fla. 2d DCA 2000). The defense on this appeal argues that it met its burden of proof on comparative negligence by introducing *662 evidence that Arturo Vidal: 1) was a smoker and obese; 2) failed to comply with Dr. Macksoud's recommendations for physical therapy following his stroke; 3) failed to appear for a scheduled visit with Dr. Macksoud; and 4) failed to provide Dr. Macksoud with his complete medical history, which included diabetes, a heart attack, triple bypass surgery, implantation of a pace maker, prostate cancer, two hernia operations, and peritonitis. The record evidence reveals that the defense is simply wrong.
First of all, although Vidal's history of smoking and obesity are certainly risk factors for a stroke, there is absolutely no record evidence before us that they are also risk factors for cervical myelopathy or cervical cord compression. Given the fact that the jury ultimately accepted the plaintiff's theory that Vidal's injuries were the result of undiagnosed cervical myelopathy rather than a stroke, evidence of his smoking history and obesity would be insufficient to establish comparative negligence.
Next, any evidence of Vidal's failure to attend any of his physical therapy sessions would similarly be insufficient to support a finding of comparative negligence. Although the evidence established that physical therapy would be beneficial to a stroke victim, the uncontroverted expert evidence at trial revealed that physical therapy would not benefit a patient suffering from cervical myelopathy.[1]
As to the contention by the defense that Vidal's failure to attend a scheduled visit with Dr. Macksoud constituted evidence of his comparative negligence, the appellants correctly point out that this was merely raised during closing argument by defense counsel. Even assuming, arguendo, that such evidence had been adduced at trial, there was no evidence of a causal link between any missed appointment and Vidal's resulting injuries.
Finally, Dr. Macksoud contends that Vidal's failure to provide her with a complete medical history was sufficient evidence of his comparative negligence to sustain the jury's assessment. The problem with this argument, however, is that there is absolutely no record evidence that Vidal either negligently or intentionally withheld any solicited information about his medical history from Dr. Macksoud.[2] More importantly, however, both Dr. Macksoud and the defense experts testified that even armed with knowledge about Vidal's complete medical past, Dr. Macksoud's initial diagnosis of stroke would nevertheless have been correct.[3] Thus, there still *663 would have been no causal link between Vidal's failure to give a complete medical history and his resulting injuries.
Thus, given the jury's findings that Vidal's damages were the result of undiagnosed cervical myelopathy rather than stroke as opined by Dr. Macksoud, it is clear that the comparative negligence claim was unsubstantiated by the record evidence and cannot stand. We therefore reverse the order denying the plaintiff's renewed motion for directed verdict on the comparative negligence claim and remand with instructions that final judgment be entered in accordance with this opinion.
Reversed and remanded with instructions.
NOTES
[1] Interestingly, defense counsel conceded as much in closing argument when he stated:

"What we also have is, if, in fact, there is a cord compression going on and it is somehow only affecting his right leg, everybody agrees, you wouldn't see improvement [from therapy]."
[2] Additionally, we know of no legal duty imposed upon a patient to independently disclose a history of all medical ailments, absent solicitation by the treating physician and the appellees have cited to none.
[3] In this regard, Dr. Macksoud testified as follows during direct examination by her counsel:

Q. Now, even if he told you that I have neck pain so you could make a better diagnosis, would that change your diagnosis on this date that he was suffering from a basal ganglia infarct [stroke]?
A. Not on this date.
Q. And that's because of what he was complaining of then?
A. Right.
Q. If you had seen the note with Mr. Serrano's belief that he had found right leg weakness and you or yourself, patient didn't have right leg weakness, would that have changed your impression in any way?
A. It would have not changed it because I did not find the patient had weakness.
The defense neurology expert, Dr. Edward Feldman, similarly opined as follows:
Q. In reviewing the records I provided you, did you see reference to back in the 70s and 80s, some complaints of neck pain?
A. Yes.
Q. Radiating pain?
A. Yes.
Q. Does that change the diagnosis of what was going on October 8, 1996, that past history?
A. No. You have to interpret on how he's presenting at that time.
Q. Does that change how a neurologist should approach his visit?
A. Not in any way, no.
Q. Is this visit of October 8, 1996, less likely to be a stroke and more likely to be a cervical cord?
A. No. You'll have to go on history and the lab tests.
Q. In a case like this where a patient comes in with this history and complaints, is there any reason that a neurologist should go back and look at twenty or thirty years of medical records?
A. First of all, you almost never have them. You never have them. And if you went back and looked, you will say Mr. Vidal had one of the most common things all people have, arthritis in the neck. That doesn't impact this diagnosis of stroke in any way.
Q. So if Dr. Macksoud didn't go back and look at prior records, that's not a deviation from the standard of care?
A. Not at all.
Q. Even if that information is available to a neurologist given this, would it change the approach in this case?
A. It would not have changed my approach at all, no.
Q. Would you have reached the same diagnosis?
A. Yes.
Q. Would your plan have been the same?
A. Yes.