FARMER, J.,
dissenting.
Medicine is a learned art. A very learned art. Actually, a very, very learned art. Doctors begin with 4 years undergraduate college education, concentrating in the life sciences. Then they have 3 or 4 years of medical school dealing significantly with all manner of health care subjects. That is usually followed by internships, residencies and fellowships, often adding another 6 or 7 years of highly specialized education and training. So it is that when a Doctor becomes Board Certified in a medical specialty, the only person qualified to challenge that Doctor’s judgment is another, equally qualified Doctor with comparable education, training and experience.[1] Surely no patient without medical training can do so.
On medical subjects, therefore, Doctors and their patients are usually on different levels. On very different levels. No, on very, very different levels. They are as far apart as it is possible to be. They are separated by a mammoth chasm in medical knowledge. As a matter of law we should acknowledge that the average patient cannot be deemed to know what a Doctor knows about a medical subject.
The major part of a Doctor’s treatment tools today is neither technique nor implement. It is chemicals. Medicine. Substances introduced by the Doctor into the patient. Altering a patient’s interior biochemistry. Many such chemicals — some controlled substances — can have adverse effects on patients. Doctors must know all possible side effects of these substances, as well as their specific indications and efficacy.[2] I mean, no competent patient would knowingly exchange a current medical problem for a worse one. Here again the level of inequality in knowledge is Grand Canyon vast.
Because of this disparity, Doctors are fiduciaries in medicine for their patients.[3] *1169 And the fiduciary duty imposed on Doctors who administer substances to their patients could not be more plain. Doctors must spontaneously and voluntarily make prior disclosure of all possible side effects from a substance they administer, whether or not a patient asks.[4] Because the Doctor is bound by fiduciary ties,[5] the patient is entitled to rely not only on what the Doctor tells the patient but equally on what the Doctor does not say.
In this case, before she even visited the Doctor she inquired about possible effects on driving caused by the planned treatment. She asked his office — hence, she asked him[6] — whether she should arrange for transportation home after the planned treatment. His office — hence, he personally — responded that such transportation was not indicated.
At her treatment, the Doctor later decided he should administer a substance to assist the procedure. Yet when he gave the substance to her, he said nothing to indicate any adverse effect. The Doctor is deemed to know that the substance could cause side effects diminishing her ability to drive herself home. Did he ask her if she has a ride? Did he ask if she needed assistance? Did he warn her not to drive herself? The answer to all these questions is indisputably shown by the record as an unrefuted NO. He said nothing about the substance; he gave her no warnings. The gulf in knowledge between them about the substance remained undisturbed.
The law presumes she knew of her legal right to informed consent in medical treatment. That he has a duty to tell her of any adverse effects from any treatment he administered to her.[7] As the beneficiary in the fiduciary relationship, she was therefore entitled to understand that the response of his office to her inquiry represented his medical judgment about anything done to her during the treatment. Especially because his office had responded that she could do so when she had previously asked him about driving, she could reasonably rely on his apparent medical judgment there was no medical basis to instruct her to the contrary.
The trial judge and majority think there is evidence of her personal negligence to allow the jury to make a factual finding that she was negligent in driving herself home from the treatment. But the only evidence they cite is that she drove herself home after his office had told her she would be able to do so and later one of his nurses told her during the visit that only the Doctor could say whether the substance could affect driving.
Again, the Doctor had the duty to warn her of side effects but gave no such warning when she herself raised the issue. Because of his superior medical knowledge in this fiduciary relationship, she had every reason to take his earlier response when she had raised that very subject as a positive indication of no adverse effects on driving. No evidence in the record on appeal transformed his fiduciary duty to warn her correctly into a patient duty to *1170 worry about his judgment in advising her that she could drive herself — that is, instead to keep asking him until he finally relents and says don’t drive.
According to the majority, she must magically divine what he knew about the drug in spite of his prior advice — which was left unchanged during the visit. They hold she must be deemed aware of adverse effects because she raised the subject rather than because he had responded by warning her about driving. They hold she had a duty to ignore his first answer and instead somehow deduce he had actually breached his fiduciary duty to give her some warning. Verily, they hold her to knowing what he knew!
Obviously, some patients do neglect instructions from their Doctors. But to impose comparative negligence on them, the cases require Doctors to specifically plead and prove that the patient failed to follow a specific instruction or warning actually made by the Doctor.[8] To repeat myself— perhaps overmuch — here the record is clear that this Doctor, in fact, never instructed or warned his patient, nor pleaded nor proved that he had. Rather, that record is clear that he breached his fiduciary duty of informed consent by failing to disclose adverse effects of the substance.
The fiduciary principle governing the comparative negligence defense may be succinctly stated thus: the Doctor must protect his patient from his own treatment and ministrations.[9] And so, physician-patient law does not require patients to assume they must protect themselves at all times from a Doctors’ prescribed ministrations and treatment.[10] Such a view would contravene the expectations and goals of both sides in health care practice. For this reason, the cases hold that to trigger a duty of patient self-protection from his treatment the Doctor must first prove he gave a suitable warning/instruction indicating that his patient should protect herself from something he was doing or giving to her.[11] Because this patient asked for and received no warning to the contrary, she was entitled to rely on the safety of the substance and the absence of danger. There is no evidence that she was anything but appropriately trusting with her Doctor.
Hence, this case does not involve any comparative negligence or duty of patient self-protection. The basis for this decision is a chimera. It was legal error to allow the Doctor’s naked affirmative defense go to the jury when it so obviously lacked competent supporting evidence.
This case should be reversed for a new trial.

. See § 766.012(5), Fla. Stat. (2009).

. See § 766.103(3)(a)2, Fla. Stat. (2010) (Doctor must furnish sufficient information under the circumstances to give reasonable individual general understanding of the substantial risks and hazards inherent in the proposed treatment or procedures).

.See Gracey v. Eaker, 837 So.2d 348, 354 n. 6 (Fla.2002) ("This Court ... has determined that a fiduciary relationship exists between physician and patient, whether the physician is a psychotherapist or not”); Nardone v. Reynolds, 333 So.2d 25, 39 (Fla. 1976) (recognizing the fiduciary relationship of physician and patient and imposing duty on the physi *1169 cian to disclose known facts, but not conjecture or speculation).

. See n. 2 above.

. "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.” Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546; see also Moore v. Regents of Univ. of Cal., 51 Cal.3d 120, 271 Cal.Rptr. 146, 793 P.2d 479, 485 n. 10 (term fiduciary signifies that physician must disclose all medical facts material to the patient’s decision). See also n. 8 below.

. Because the nurse is his agent, the Doctor is deemed by law to know what his nurse knows.

. See n. 2 above.

.See e.g. Vidal v. Macksoud, 933 So.2d 659, 661 (Fla. 3d DCA 2006) (defendant in medical malpractice action has burden to plead and prove specific acts of patient negligence); Riegel v. Beilan, 788 So.2d 990, 991 (Fla. 2d DCA 2000) (if healthcare provider does not provide patient sufficient information patient cannot be charged with comparative negligence); Swamy v. Hodges, 583 So.2d 1095, 1096 (Fla. 1st DCA 1991) (to prove comparative negligence, Doctor had to show that patient had a duty, that the duty was breached, and that such breach was the cause of the damage about which plaintiff complains); Borenstein v. Raskin, 401 So.2d 884, 886 (Fla. 3d DCA 1981) (to establish defense of comparative negligence in medical malpractice action, Doctor had to prove that patient owed herself a duty of care, that patient breached that duty, and that such breach was proximate cause of damages patient sustained).

. See nn. 2 & 5 above.

. Few patients would use and trust Doctors whose judgment and treatment required self-protection.

. See n. 8, above.